Steven G. CHILDERS

v.

**DALLAS POLICE DEPARTMENT, Donald A. Byrd, and Tom Lochenmeyer.**

No. CA3–76–0469–F.

United States District Court,
N. D. Texas,
Dallas Division.

March 30, 1981.

American Civil Liberties Union, Dallas, Fred Time, Dallas, Tex., for plaintiff.

Joseph G. Werner, Asst. City Atty., Dallas, Tex., for defendants.

## MEMORANDUM OPINION AND ORDER

ROBERT W. PORTER, District Judge.

Steven Childers, Plaintiff herein, has brought this suit under 42 U.S.C. §§ 1983, 1985 and 1986, and under the First, Ninth and Fourteenth Amendments to the Constitution. He claims that the actions of the Defendants have also violated Tex.Rev.Civ. Stat.Ann. art. 6252–16. (Supp.1980).[1] Jurisdiction was invoked pursuant to 28 U.S.C. §§ 1331 and 1332, and 28 U.S.C. § 1343. Plaintiff is seeking damages in the amount of $105,000.00, attorneys fees, and declaratory and injunctive relief pursuant to 28 U.S.C. § 2201 and § 2202. The gravamen of his complaint is that Plaintiff was denied promotional opportunities and was discriminated against in his employment because of his religion and related First Amendment activities, and because of his sexual preference. Plaintiff is a male who is admittedly homosexual in both practice and preference. Defendants are the Dallas Police Department, Donald A. Byrd who at the relevant time was the Chief of Police,[2] and Tom Lochenmeyer, who was the Supervisor of the Property Division of the Dallas Police

---

1. Art. 6252–16 provides:

 Section 1. (a) No officer or employee of the State or of a political subdivision of the state, when acting or purporting to act in his official capacity, may:

 (1) refuse to employ a person because of the person's race, religion, color, sex, or national origin . . .

2. Plaintiff testified that he never talked with Defendant Don Byrd and that he did not know whether Defendant Lochenmeyer had ever discussed him with Byrd. It is clear that Byrd had no knowledge of Lochenmeyer's rejection of Plaintiff's employment application prior to Plaintiff's filing of a grievance with the Civil Service Board of the City of Dallas. There is, therefore, no evidence upon which to base a finding of conspiracy under 42 U.S.C. § 1985.

Department.[3] A trial was held to the Court, and this opinion constitutes Findings of Fact and Conclusions of Law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I. FACTUAL BACKGROUND

Inasmuch as the facts of this case are crucial to my holding, it is necessary to review the specific circumstances in some detail. Steven Childers was first employed by the City of Dallas in May 1969 as an unclassified laborer with the Dallas Water Utilities Department. Subsequently he was examined under Civil Service procedures and was given the position of Storekeeper # 5, a classified employee. On May 1, 1973, Childers took a Civil Service examination for classification as a Storekeeper # 7, and it is uncontested that he made the highest score of anyone who took that examination. Childers' personnel reports from 1972, 1973 and 1974 show him to have been a satisfactory and in some respects a superior employee with the City.

Because of this test score and his prior work record, Childers became eligible to be considered for a position with the Property Division of the Dallas Police Department, and he applied for a job there. The job in the property room entailed handling and recording all property and drugs coming into the custody of the police department, as well as occasionally going to the scene of a crime.[4] Defendant Tom Lochenmeyer, a Sergeant with the police department who was the Supervisor of the Property Division, interviewed Plaintiff for the position. Lochenmeyer had the final word as to whether any employee was hired into the Property Division.[5]

The parties agree that following this first interview, Childers was not hired for the Storekeeper # 7 position and that he was not given a reason for his failure to be hired. There is a dispute between the parties, however, as to the substance of the interview. During the course of the interview the subject of Plaintiff's sexual orientation and activities and his affiliation with the Metropolitan Community Church (MCC) was discussed. Childers admits he disclosed that he belonged to the Metropolitan Community Church and that he took part in gay activities, but he asserts this disclosure was in response to direct questions from Lochenmeyer about his sex life and religion. Childers claims that he was surprised at these questions but answered honestly that he was a deacon with the MCC. Defendant purportedly asked what the MCC was, and Plaintiff responded that it was a Christian church with a special outreach to the gay community. Plaintiff said he told Lochenmeyer that the purpose of the church was to minister to the needs of the gay community and that the church was formed by people driven out of more conventional

---

**3.** Originally, this suit was brought against the Water Utilities Department, the Director of the Water Utilities Department and other Water Department supervisory personnel, in addition to the above named defendants. Plaintiff voluntarily withdrew and dismissed his claims against the Water Utilities Department parties when he filed an amended complaint in 1977. Plaintiff was never employed by the present Defendants. They dealt with him in an employer-employee context only to the extent that they refused to accept him as an employee transferred from another department within the city government. Although Plaintiff argues in his brief that he was subjected to retaliatory treatment and harassment, denials of vacation, fair work hours and other benefits and rights, these acts, if they occurred, are not attributable to the Police Department, Donald Byrd or Tom Lochenmeyer.

**4.** The property storeroom has in its control, among other things, sexual paraphernalia confiscated in homosexual and male prostitution raids, and homosexual mail order material.

**5.** Lochenmeyer testified that he was required to make employment recommendations to his Division Commander, but that there had never been an occasion in which the Division Commander had not agreed with Lochenmeyer's recommendation.

The civil service test score and other requirements are the minimum criteria for employment with the City. Each department then has its own criteria. In addition to the Civil Service requirements, Lochenmeyer testified that he looked for honesty, integrity, cooperation, ability to get along with people, and ability to type. He testified that religion was never a factor in his decision.

churches. Childers testified that Lochenmeyer seemed surprised that Plaintiff belonged to the MCC and that he assumed Childers was gay without asking. Plaintiff admitted, however, that although he did not recall Lochenmeyer asking him specifically if he were gay, the fact may have come out in the conversation. Childers also testified that Lochenmeyer told him, "I think you should know there are a lot of cops who like to bust fags."

Lochenmeyer's version of what transpired during the interview differs substantially from Plaintiff's version. Lochenmeyer testified that he asked Plaintiff to relate anything that might affect his job function, and Childers said he could type. Lochenmeyer asked Childers where he learned to type, and Childers responded that he learned at his church. Lochenmeyer was not familiar with what the MCC was, and, therefore, Plaintiff elaborated. Childers said he wanted to be honest and told Lochenmeyer he was gay. Childers assured Lochenmeyer that he would not have to worry about him, however, because he (Childers) was "married". His "spouse" was outside in the car. Lochenmeyer claims that he did not react to Plaintiff's admission, but that at that point he determined that Childers was disqualified from the job. Lochenmeyer based his decision on the fact that Childers was telling him that he was an habitual lawbreaker. Lochenmeyer said he believed Childers would be a security risk because of the kind of contraband that the property room controls, and because Childers might warn other homosexuals of impending police raids. Lochenmeyer disqualified Childers without checking his work or arrest records.

On April 4, 1974, Childers again took the Civil Service examination for the Storekeeper # 7 position, and he passed the test with a score higher than the previous one. Again Plaintiff interviewed with Defendant Lochenmeyer for the job in the police department property room. Plaintiff testified that he was somewhat upset at this interview. Although Lochenmeyer did not remember Childers from the earlier interview, Childers reminded Lochenmeyer who he was and that he was gay. Plaintiff asked why he had not been hired before, and Lochenmeyer told him it was because of his activist gay activities at the MCC. At that time Plaintiff had admitted that he had marched in two Gay Pride Parades. He had also participated in picketing to protest an episode of the Marcus Welby television program which, according to Childers, had portrayed homosexual males as child molesters. Plaintiff stated that the purpose of the Gay Pride parades was to celebrate Gay Pride Week and to educate the community that stereotypes of gays are untrue. The first interview Childers had with Lochenmeyer had taken place between the first and second Gay Pride parades.

Plaintiff further testified that a long discussion followed during which he told Lochenmeyer that he did not believe religion had anything to do with job performance. Lochenmeyer purportedly told Plaintiff that he would have to have a high tolerance for jokes, but that there was a point beyond which he would take offense. Childers retorted that if Lochenmeyer were Jewish he would take offense at jokes about Nazi Germany. Childers claims he was told that he would not be hired because of the emotional strain it would cause. Lochenmeyer testified he told Childers he would not be hired because he would be a security risk and because his sexual practices violated state law. In any event, Childers testified that he agreed it would be preferable that other reasons be given for why he was not hired; thus, Plaintiff declined the job.

## II. FIRST AMENDMENT CLAIMS

Childers' initial contention is that Lochenmeyer's refusal to hire him into the Property Division Storekeeper # 7 position was in violation of Plaintiff's First Amendment rights to freedom of religion and association.

Plaintiff's claim that the Defendants violated his right to freedom of religion is frivolous. Lochenmeyer testified that his refusal to hire Plaintiff had nothing to do with Plaintiff's religion, and there

is no credible evidence to the contrary. Childers' activist gay activities may, of course, have been tangentially related to the Metropolitan Community Church, in that the church had a special outreach to the gay community. The mere fact, however, that an activity comes under the auspices of a church does not mandate a finding that that activity is constitutionally protected. In this instance, it was admitted by Plaintiff that the MCC does not require its members to be homosexual and that at least 20% of the membership of the MCC is not homosexual. The MCC does not require its members to engage in homosexual acts. There was no evidence that the MCC requires its members to actively espouse homosexual causes. There was no evidence that homosexuality is one of the religious precepts of the MCC. Therefore, because Childers' homosexual practices and activities were neither mandated nor prompted by his religion, I find that Plaintiff's freedom of religion was not infringed.

The question of whether Defendants' actions unconstitutionally infringed Plaintiff's First Amendment right of expression and association is more troublesome. Defendant Lochenmeyer admitted to having a negative attitude when he learned that Childers had taken part in activities advocating the lifting of restrictions on homosexual conduct. He also admitted that, following the second interview, he refused to hire Childers, at least in part, because of his activist gay activities. The pivotal question, then, is whether Childers' activities were protected by the First Amendment.

■ The rights to freedom of speech, assembly and petition, like religion, are expressly protected by the First Amendment, and there is no doubt that the right of association is encompassed by these explicit guarantees. "Among the rights protected by the First Amendment is the right of individuals to associate to further their personal beliefs." *Healy v. James*, 408 U.S. 169, 181, 92 S.Ct. 2338, 2346, 33 L.Ed.2d 266 (1972). Steven Childers' efforts to organize the homosexual minority, to educate the public as to its plight and to obtain for that

minority better treatment or a change in the laws respecting homosexuality represent a clear example of the associational activity singled out for protection under the First Amendment. *See, e. g., NAACP v. Button*, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); *Bates v. City of Little Rock*, 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama*, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Gay Students Org. of New Hampshire v. Bonner*, 509 F.2d 652 (1st Cir. 1974). The right to engage in this activity is not conditioned on the presence or absence of majority endorsement of the views or ideas espoused, for the fundamental purpose of the First Amendment is to protect from State infringement the free expression of controversial, unconventional or unpopular ideas. *Aumiller v. U. of Delaware*, 434 F.Supp. 1273, 1301 (D.Del.1977); *see, Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949).

The issue here, however, is not whether individuals of whatever sexual persuasion have the right to meet, discuss current problems and to advocate changes in the status quo, for that right clearly exists. The issue is to what extent a governmental entity—in this instance, a police department—may justifiably burden that right or exact a penalty for its exercise, by denying public employment because of it.

■ Although the First Amendment has a preferred position in our jurisprudence, it is well recognized that First Amendment freedoms are not absolute. While the government may not place a burden on speech or association simply because it finds the views expressed abhorrent, First Amendment freedoms must be viewed in light of the special circumstances of the environment of a particular situation. *Healy, supra*, 408 U.S. at 187–188, 92 S.Ct. at 2349; *Smith v. United States*, 502 F.2d 512, 517 (5th Cir. 1974). In the arena of public employment, especially, there are circumstances in which the state has interests that conflict with the constitutional interests of its employees. Although public employment is a benefit that cannot be conditioned upon the denial of constitutionally

protected interests, *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972), within certain limits the government as an employer has the right to control the conduct and speech of its employees.

■ The seminal case enunciating these principles is *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), where the Supreme Court was confronted with a situation in which the public interest in efficient operation of a school conflicted with a teacher's right of free expression. There the Court noted that:

> "[t]he theory that public employment which may be denied altogether may be subjected to any conditions, regardless how unreasonable, has been uniformly rejected" ... At the same time, it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Id.* at 568, 88 S.Ct. at 1734. The outcome of the ad hoc balancing test mandated in *Pickering* will determine whether the refusal to hire a public employee is constitutionally permissible because his interest must yield to an overriding interest of the government, or whether instead the speech is constitutionally protected.[6]

■ Under the balancing test, an employee must meet the initial burden of establishing that he was not hired because of his expression. Once that hurdle has been surmounted, the burden shifts to the government to show that the employee's speech would have impeded his performance or otherwise interfered with the efficient operation of the government. The requisite degree of injury a state must demonstrate in order to support a speech based refusal to hire is that the expression causes a "material and substantial" disruption or interference. *Tinker v. Des Moines Ind. Community School Dist.,* 393 U.S. 503, 509, 89 S.Ct. 733, 737, 21 L.Ed.2d 731 (1969); *Van Ooteghem v. Gray,* 628 F.2d 488 (5th Cir. 1980), *rehearing en banc granted,* 640 F.2d 12 (1981).[7]

■ Assuming that Childers was not hired, in part, because of his gay activities, Plaintiff has satisfied his burden of showing that he was refused the Storekeeper # 7 position because of his expression. I conclude, nevertheless, that the government has met its burden of showing that its refusal to hire Childers was justified and necessary to prevent the material and substantial interference with Childers' performance of his duties and the efficient operation of government.

I reach my conclusion based on a number of factors. First and foremost, it must be remembered that the governmental entity involved here is the police department of a major metropolitan area. No one can disagree that the character and activities of

---

6. The Court in *Pickering* declined to enumerate specifically those factors that are to be weighed in arriving at a proper balance, but it alluded to some general considerations that might show impairment of a governmental interest sufficient to activate the balancing test. These include the government's interest in removing incompetent employees, in maintaining discipline by immediate superiors, in preserving harmony among coworkers, or in maintaining personal loyalty and confidence when necessary to a particular working relationship. 391 U.S. at 570, 88 S.Ct. at 1735.

7. Judge Goldberg indicated recently in *Van Ooteghem* that the Pickering test for determining whether speech is constitutionally protected has been refined by subsequent cases. He states that "the analysis is more properly phrased as to whether the government's regulation of constitutionally-protected speech is justified by a compelling state interest." 628 F.2d at 493 n.4. In any event, "the compelling state interest standard is satisfied only upon proof that the regulation of speech was necessary to prevent a 'material and substantial interference' with the operation of the public department." *Id.,* at 492.

those to whom we entrust the enforcement of our laws must be beyond reproach. The activities of an employee of a law enforcement agency are of paramount interest to that agency, as the police department as a whole must reflect the values of a majority of society.

In this case, the evidence clearly reflects that Childers was in no way inclined to be discreet about his homosexuality or his homosexual activities. He publicly advocated homosexuality while he was an employee of the City of Dallas, and he was identified as an employee of the City of Dallas while publicly advocating homosexuality. Plaintiff also admitted freely that he cohabited in a sexual relationship with another man while he was an employee of the City of Dallas and was so living at the time of both interviews with Tom Lochenmeyer.[8]

In *Singer v. United States Civil Service Comm'n*, 530 F.2d 247 (9th Cir. 1976), *vacated and remanded*, 429 U.S. 1034, 97 S.Ct. 725, 50 L.Ed.2d 744 (1977),[9] the Court affirmed the dismissal of a government employee who had openly flaunted his homosexual lifestyle, had sought a marriage license with another man, and who had indicated his intent to continue such activities while identifying himself as a federal employee. The Ninth Circuit held that the Civil Service Commission could rationally conclude that public knowledge that the government employed a homosexual employee "reflects discredit upon the Federal Government as his employer, impeding the efficiency of the service by lessening public confidence in the fitness of the government to conduct the public business with which it was entrusted." *Id.* at 255. Similarly, in *McConnell v. Anderson*, 451 F.2d 193 (8th Cir. 1971), *cert. denied*, 405 U.S. 1046, 92 S.Ct. 1312, 31 L.Ed.2d 588 (1972), the Court upheld the refusal of a state university to hire an applicant for a position in the university library because of the applicant's assertion of the right to pursue an activist role in implementing his unconventional ideas about homosexuality, which would have thereby foisted tacit approval of homosexuality upon his employer.[10]

Steven Childers' activities were equally inconsistent with and substantially deleterious to the efficient operation of government. The issue of homosexuality is one charged with emotion and anxiety. Homosexuality is a controversial topic, and it is quite likely that Plaintiff's view is a minority view. This court appreciates, of course, that a primary purpose of the First Amendment is to protect minority views, and that speech "may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with things as they are, or even stirs people to anger." *Terminiello, supra*, 337 U.S. at 4, 69 S.Ct. at 895; *Acanfora v. Bd. of Education*, 359 F.Supp. 843, 854 (D.Md.1973), *aff'd on different*

---

**8.** Although Plaintiff testified that Lochenmeyer brought up the subject of Childers' homosexuality, I simply do not find it credible that Lochenmeyer said directly to Plaintiff, "Tell me about your sex life and your religion." Even were I to accept that version of what transpired, such a question was presumably invited by Childers, in that his resume is quite explicit about his gay activities in association with the Metropolitan Community Church.

**9.** Singer was vacated and remanded based on the Solicitor General's suggestion that the action of the Civil Service Commission should be reconsidered in light of recently adopted changes in the Civil Service Personnel Manual.

**10.** Plaintiff relies on *Acanfora v. Board of Education*, 359 F.Supp. 843 (D.Md.1973), aff'd 491 F.2d 498 (4th Cir. 1974), and *Aumiller v. University of Delaware*, 434 F.Supp. 1273 (D.Del. 1977), for the proposition that his activities were protected. Both cases make clear, however, that neither plaintiff had engaged in open or public flaunting of his homosexual conduct. In fact, in *Aumiller*, the Court distinguished *McConnell* and *Singer*:

> [t]he plaintiffs in those cases appeared to engage in certain activities for the express purpose of generating publicity or notoriety. Aumiller, by contrast, never engaged in comparable public conduct such as applying for a marriage license, kissing a man in public, or *participating in homosexual demonstrations.* Aumiller never set out to generate publicity . . . (emphasis added) 434 F.Supp. at 1293.

The facts in the instant case are obviously closer to those in *Singer* and *McConnell* than in *Acanfora* and *Aumiller*, since the evidence is undisputed that Childers participated in at least three homosexual demonstrations.

*grounds*, 491 F.2d 498 (4th Cir. 1974). Nonetheless, when activity of the sort in which Childers was involved is undertaken publicly, it undermines the legitimate needs for obedience and discipline within the police department. Such activity will undoubtedly foment controversy and conflict within the department. These considerations, as well as the concern of the police department to protect its public image and to avoid ridicule and embarrassment, are more than sufficient justification for Lochenmeyer's refusal in this instance to hire an admitted homosexual who actively publicized his lifestyle.

Moreover, the needs of the particular job into which Plaintiff sought to be hired mandate this conclusion. The property room job entailed the handling of evidence in offenses involving homosexual conduct. Such a job undeniably requires personal and departmental loyalty and confidence for its proper functioning. *See Pickering, supra.*[11] There is good reason to question whether Plaintiff would have exhibited or inspired these attributes. Plaintiff's views about homosexuality would have interfered with his duties in the property room. *See, Phillips v. Adult Probation Dept.*, 491 F.2d 951 (9th Cir. 1974). It is likely that Plaintiff would have been subject to harassment by his fellow workers, and that Plaintiff's gay activities would have promoted unrest and disharmony among his co-workers.[12] *See Smith v. United States*, 502 F.2d 512 (5th Cir. 1974).

Under these circumstances, because of the peculiar conditions inherent in the police department and legitimate public need, I have no trouble deciding that the government's interest in maintaining the efficient operation of the police department and ensuring the proper performance of duties in the Storekeeper # 7 job, outweigh Plaintiff's interest in constitutional protection for his expression and association. I emphasize that Plaintiff is in no way being denied the opportunity to associate whenever and with whomever he pleases. He is denied only the opportunity to work in the property room of the police department. Thus, I hold that the Defendants have not unconstitutionally infringed Childers' First Amendment rights.[13]

11. Compare *Norton v. Macy*, 417 F.2d 1161 (D.C.Cir.1969), where the discharge of a homosexual was held unconstitutional. The Court noted, however, that

[i]f an employee makes offensive overtures while on the job, or if his conduct is notorious, the reactions of other employees and of the public with whom he comes in contact in the performance of his official functions may be taken into account. Whether or not such potential consequences would justify removal, they are at least broadly relevant to the 'efficiency of the service.'" Id. at 1166.

12. There is also the possibility that Plaintiff would be subject to a great deal of stress, which would interfere with the proper performance of his duties. Dr. Myron Weiner, a psychiatrist with the University of Texas Southwestern Medical School, was called as a witness by the Plaintiff to testify as to the attitudes and attributes of homosexuals and as to their ability to be socialized into society. On cross examination Dr. Weiner testified that homosexuals were likely to suffer emotional stresses, including feelings of inferiority and of being left out, generated by society's attitude regarding homosexuals. He also testified that many homosexuals may feel that laws prohibiting homosexual conduct do not make sense and that these homosexuals may feel persecuted.

It is clear that these feelings and the accompanying emotional pressures may cause an aggravation of anxiety and conflicts within homosexuals, affecting a homosexual's relationship with law enforcement officers.

13. Even if Childers had proved that his speech and association were "protected", he has failed to show that the refusal to hire him constituted a violation of his First Amendment rights. A showing that speech interests are protected is only the first step of a three-pronged analysis. The Court must make the further inquiry of whether the speech was a "substantial and motivating" factor in the refusal to hire, and whether Plaintiff would not have been hired even in the absence of his protected speech. *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed. 471 (1977); *Givhan v. Western Line Consolidated School District*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Van Ooteghem v. Gray*, 628 F.2d 488 (5th Cir. 1980), rehearing en banc granted, at 12 (1981). I am not convinced that Childers' First Amendment activities actually played any real part in the police department's refusal to hire him. Even if they did, however, the government plainly carried its burden of proving that Childers would not have been hired regardless of those activities. The over-

## III. DUE PROCESS OF LAW

The due process questions that Childers raises in regard to the actions of the Dallas Police Department are both sensitive and complex. The court must consider interrelated questions of procedural and substantive due process. Childers has challenged as unconstitutional the actions of the Police Department in refusing to hire him into the property room and the regulations and policies upon which the actions were based. Since this court is limited to determining whether the Constitution prohibits the actions here, I cannot say that constitutional limitations have been exceeded.

### A. PROCEDURAL DUE PROCESS

▇▇▇▇ The requirements of procedural due process are applicable only to interests encompassed by the Fourteenth Amendment's protection of liberty and property. If either liberty or property is at stake, an individual has, of course, a right to a fair procedure before that interest is deprived. Thus, in determining whether the Police Department's failure to hire Plaintiff in any way violated the requirements of due process, the first inquiry is whether Plaintiff was deprived of any interest in either property or liberty. *Board of Regents v. Roth*, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). If no protectable liberty or property interest is found to be implicated, no process is "due" and no reasons or hearing need be given. *Webster v. Redmond*, 599 F.2d 793 (7th Cir. 1979), *cert. denied* 444 U.S. 1039, 100 S.Ct. 712, 62 L.Ed.2d 674 (1980). Here, the Court must decide (1) whether Childers had a property interest in obtaining the Storekeeper # 7 job in question, and (2) whether the Police Department's decision not to hire Plaintiff infringed a protectable liberty interest.

### 1. Property Interest

The first issue is whether Childers had a protectable interest in property that was impaired or destroyed by the Police Department's refusal to hire him. In *Roth, supra*, the Supreme Court stated that "[p]roperty interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits" 408 U.S. at 577, 92 S.Ct. at 2709. Plaintiff in the instant case asserts that he had a legitimate claim of entitlement to the Storekeeper # 7 position.

▇▇▇▇ Plaintiff's claim of entitlement allegedly arose out of the "policies and practices" of the employing institution. *Perry v. Sindermann*, 408 U.S. 593, 603, 92 S.Ct. 2694, 2700, 33 L.Ed.2d 570 (1972). Childers alleges that he had an expectation of promotion stemming from the Defendants' merit-based promotion system within the Civil Service and from the Plaintiff's performance in that system, including his seniority, competence, experience, and scores on the Civil Service examinations. Plaintiff's claim is, essentially, that he had an implied right to the Storekeeper # 7 position.[14]

Childers construes the Civil Service procedures to mean that the Police Department has no choice but to hire an applicant when that applicant has a satisfactory and in some respects superior prior performance record. The key ingredient to Childers' alleged property interest is, however, entitlement. Without expressing a view as to the subjective qualifications of Plaintiff for the Storekeeper # 7 job, the critical fact is that Childers was a mere applicant for the position. It cannot be fairly inferred that the

---

riding reason that the Plaintiff was not hired was because he admitted to engaging in homosexual conduct prohibited by Texas penal statutes and was thereby in violation of police department regulations.

14. A property interest in employment can arise from statute or regulation, or from an implied contract. *Bishop v. Wood*, 426 U.S. 341, 345, 96 S.Ct. 2074, 2077, 48 L.Ed.2d 684 (1976); *McElwee v. Todd*, 581 F.2d 1182, 1184 (5th Cir. 1978).

policies and procedures of the Civil Service and the Police Department guarantee an applicant promotion; they merely make him eligible for promotion. Plaintiff's only entitlement was to be considered for the job. *See Webster, supra; McElwee v. Todd,* 581 F.2d 1182 (5th Cir. 1978).

It is clear that the Police Department is a separate entity from the Civil Service and is to have the final word and power of promotion over those candidates who are eligible for promotion. The Police Department refused to employ Childers in the property room in essence because he admitted conduct violative of Section 6(x) of the Dallas Police Department Code of Conduct which makes any violation of federal or state statutes a ground for discharge or disciplinary action, because he admitted conduct violative of Section 15(G) of the Code of Conduct which prohibits cohabitation with a sex pervert of the same sex, and because he admitted to engaging in conduct that violated Section 15(E) of the Code of Conduct which prohibits any conduct which, if brought to the attention of the public, could result in unfavorable criticism of the employee or the police department.

These regulations create no expectation of employment once a person is determined to fall within the category described in an applicable regulation. Childers admitted to engaging regularly in homosexual sexual activity which is prohibited by Tex.Penal Code Ann. § 21.06, (1974).[15] He also admitted to cohabiting with Donald Armstrong, to whom Plaintiff referred as his "spouse", prior to, during and following his interviews with Defendant Lochenmeyer. The Supreme Court has said:

> To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.

*Roth, supra,* 408 U.S. at 577, 92 S.Ct. at 2709. Because of Plaintiff's admissions, any expectation he had in obtaining the Storekeeper # 7 job was unilateral. He had no legitimate claim of entitlement to the job. *Beller v. Middendorf,* 632 F.2d 788 (9th Cir. 1980). *Cf. Ashton v. Civiletti,* 613 F.2d 923 (D.C.Cir.1979) (rules and understandings of FBI gave rise to constitutional property interest.) Therefore, unless the police department may not as a substantive matter refuse to hire anyone who engages in homosexual conduct, there is no basis here to find any expectation of employment sufficient to constitute a constitutional property interest.

### 2. Liberty Interest

The next question for the Court is whether the refusal of the police department to hire Plaintiff into the Storekeeper # 7 position deprived Plaintiff of a protected liberty interest without due process. In *Roth, supra,* the Supreme Court, while rejecting a constitutional claim based on a failure to rehire an untenured teacher, acknowledged that "interests in liberty would be implicated" if the state, in declining to rehire a person, made a charge "that might seriously damage his standing and associations in his community" or "imposed . . . a stigma or other disability that foreclosed his freedom to take advantage of other employment opportunities." 408 U.S. at 573, 92 S.Ct. at 2707.

 Applying these principles, I conclude that the defendants' actions did not impair any liberty interest Childers may have had. The Defendants have made no charge that might damage Plaintiff's standing or associations in the community. This is not a case where the Plaintiff's "good name, reputation, honor or integrity is at stake". *Id.,* (quoting *Wisconsin v. Constantineau,* 400 U.S. 433, 437, 91 S.Ct. 507, 510,

---

**15.** This statute provides:

(a) A person commits an offense if he engages in deviate sexual intercourse with another individual of the same sex. . .

Tex.Penal Code Ann. § 21.01 includes the following definition:

(1) "Deviate sexual intercourse" means any contact between any part of the genitals of one person and the mouth or anus of another person.

27 L.Ed.2d 515 (1971)). There is no suggestion that the Defendants publicized in any way the reasons for Plaintiff's failure to be hired. *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Beller, supra,* at 806; *benShalom v. Secretary of Army*, 489 F.Supp. 964, 972 (E.D.Wis.1980). Any injury to Plaintiff's reputation came from his own admission. One who openly admits to certain activities cannot later be heard to complain that his reputation has been damaged.

Nor has any stigma or other disability been imposed on Plaintiff that may foreclose other employment opportunities. Again, it must be emphasized that Plaintiff openly admitted to having engaged in the conduct that allegedly imposed a stigma upon him. Moreover, Plaintiff remained free, after his failure to be hired into the property room job, to seek public employment in positions other than the one into which he was not promoted. *See Roth*, 408 U.S. at 573–574, 92 S.Ct. at 2707. Indeed, it was established at trial that Childers was offered other jobs in the city at levels comparable to the Storekeeper # 7 position.[16] *Beller, supra; Webster, supra.* Cf. *Scott v. Macy*, 349 F.2d 182 (D.C.Cir.1965), (where the stigma of "immoral conduct" imposed by the Civil Service Commission disqualified the Plaintiff from all government employment and other employment opportunities as well). As the Supreme Court found in *Roth*, "[i]t stretches the concept too far to suggest that a person is deprived of 'liberty' when he is simply not rehired in one job but remains as free as before to seek another." 408 U.S. at 575, 92 S.Ct. at 2708.

Given the fact, then, that Childers has been deprived of no protected property or liberty interests, Defendant's conduct has not violated procedural due process.[17]

## B. SUBSTANTIVE CLAIMS

Plaintiff's ultimate contention is that the police department's failure to hire him into the Storekeeper # 7 position was in violation of the substantive guarantees inherent in the Fourteenth Amendment's due process clause. Plaintiff claims essentially that the activities in which he engaged are protected as an aspect of the fundamental right to privacy, and that they may not be infringed without the showing of a compelling government interest.

The Constitution does not on its face enumerate a substantive right to privacy. The Supreme Court has, however, created a sphere of protectable interests, emanating from those rights explicitly set forth in the Bill of Rights, that are "implicit in the concept of ordered liberty," or are "so rooted in the traditions and conscience of our people as to be ranked fundamental." *Palko v. Connecticut*, 302 U.S. 319, 325, 58 S.Ct. 149, 152, 82 L.Ed. 288 (1937). This right to privacy encompasses assorted freedoms from state intrusion into family life and certain intimate decisions. *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (right to marital privacy, right to use contraceptives); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147

---

16. The evidence shows that Childers was offered a Storekeeper # 7 position with the City of Dallas Fire Department in 1976 and a Storekeeper # 7 position with the City Equipment Services Department in 1974. Childers refused both jobs, allegedly because he did not want to work on Saturdays.

17. The Court observes that only if an employer creates and disseminates a false and defamatory impression about an employee is a hearing required. If there are no factual issues in dispute, such as the case here, where Plaintiff admitted to engaging in prohibited homosexual conduct, a hearing would serve no useful purpose. *Codd v. Velger*, 429 U.S. 624, 627, 97 S.Ct. 882, 883, 51 L.Ed.2d 92 (1977); *McElwee*

v. *Todd*, supra at 1184. In any event, any liberty interest Plaintiff might have had was protected by the administrative hearings that were held. Childers admitted at trial that he had several hearings with the Dallas Water Utilities Department in regard to his grievance and that these hearings were connected with the proceedings with the Police Department. Plaintiff also admitted that he ultimately had a hearing before the Civil Service Board. It should also be noted that Childers refused to answer interrogatories and deposition questions about his relationship with Donald Armstrong. If Plaintiff would have refused to answer those questions at a hearing, he has not been deprived of due process.

(1973) (right of a woman to choose to have an abortion); *Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (freedom to marry a person of another race); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1971) (right to control matters affecting reproduction, regardless of marital status); *Stanley v. Georgia*, 394 U.S. 557, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (right to privacy in one's own home); *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (*Stone, C. J., concurring*, right to procreate).

The thrust of Plaintiff's argument is that, in light of the foregoing decisions, and as a natural consequence thereof, this Court should hold that private consensual homosexual relations between adults are protected by the right to privacy. In *Doe v. Commonwealth's Atty.*, 403 F.Supp. 1199 (E.D. Va.1975), *aff'd* 425 U.S. 901, 96 S.Ct. 1489, 47 L.Ed.2d 751 (1976), however, the Supreme Court summarily affirmed a district court decision denying a challenge to a state criminal statute prohibiting sodomy as applied to private consensual homosexual conduct. This holding seems to imply that homosexual conduct does not enjoy special constitutional protection under the due process clause.

 Childers contends, nevertheless, that after *Doe*, the Supreme Court indicated that the issue of whether and when the constitution prohibits state regulation of private consensual behavior among adults is as yet unsettled. *See, Carey v. Population Services, Int'l*, 431 U.S. 678, 688 n.5, 97 S.Ct. 2010, 2017 n.5, 52 L.Ed.2d 675 (1977). *Carey* was, however, decided by only a plurality of the Supreme Court, and in any event, the decision is quite capable of being confined by its context, though not by its terms, to private heterosexual conduct. Without an authoritative Supreme Court holding to the contrary, the Supreme Court ruling in *Doe*, though summary, is binding on this Court under the rule of *Hicks v. Miranda*, 422 U.S. 332, 344–345, 95 S.Ct. 2281, 2289, 45 L.Ed.2d 223 (1975).[18]

Even were this Court to concede, in light of *Carey*, that the reasons that have led the Supreme Court to protect certain decisions intimately linked to one's private life may also apply to homosexual conduct in some circumstances, this is not a case where such solicitude is appropriate. The situation here is not one where the State is seeking to use its criminal processes to coerce persons to comply with the moral judgments of the majority. Instead, this case requires only an assessment of a police departments' actions in refusing to hire into a sensitive position one whose conduct was in flagrant violation of police regulations. As such, this Court need only determine whether the police department's actions were rationally related to a legitimate government end. I conclude that the government's interests far outweigh any interest Childers had in constitutional protection for his homosexual behavior.

The nature of the employer, in this instance the police department, is critical to my decision, since constitutional rights must be viewed in light of the special needs and circumstances of the environment. In *Kelley v. Johnson*, 425 U.S. 238, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976), where the Supreme Court upheld as constitutional a police regulation limiting the hair length of its officers, the fact that the claimant was an employee of a police force was found to be highly significant. *Id.*, at 245, 96 S.Ct. at 1444. Justice Rehnquist stated that the judiciary owed a great deference to the local government's "choice of an organizational structure for its police force", and that "local choice necessarily gives weight to the overall need for discipline, esprit de corps, and uniformity." *Id.*, at 246, 96 S.Ct. at 1445.

Those considerations are equally applicable here. There are a myriad of grounds upon which the police department's actions and the regulations upon which those actions were based may be found appropriate for the full and efficient accomplishment of

---

18. The rule in *Hicks* is that such a summary affirmance is an adjudication on the merits. Although the basis for the Supreme Court's conclusion in *Doe* is obscure because it is unar-

ticulated, this Court must assume that the constitutional issues were considered by the Supreme Court.

the police department's mission. The regulations serve to protect the integrity of the police department and to maintain discipline. There is legitimate concern about tension between known and active homosexuals and others who detest homosexuals. There are also legitimate doubts about a homosexual's ability to gain the trust and respect of the personnel with whom he works. Moreover, the police department could rationally conclude that tolerance of homosexual conduct might be construed as tacit approval, rendering the police department subject to approbation and causing interference with the effective performance of its function.[19]

 Under *Kelley*, the Plaintiff has the difficult task of demonstrating that the police department's actions were so irrational as to be arbitrary. 425 U.S. at 248, 96 S.Ct. at 1446, citing *Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed.2d 563 (1955). Given the extreme deference that the Supreme Court has given police department policies, there can be little dispute that in this instance the police department's actions and the regulations upon which they were based were neither irrational nor arbitrary. Numerous courts faced with similar factual situations have refused to find actions of governmental agencies in discharging employees for homosexual conduct and activities either arbitrary or capricious. *See, e. g., Beller, supra; Singer, supra; McConnell, supra; Anonymous v. Macy*, 398 F.2d 317 (5th Cir. 1968).[20] These authorities, as well as the considerations enumerated above, are adequate to sustain the police department's actions against challenge in this case.[21] I hold, therefore, that Childers was not deprived of due process of law.[22]

## V. CONCLUSION

Because of the sensitivity of the issues surrounding homosexuality and the fact

---

19. It is arguable that the police regulations here are perhaps broader than is necessary to accomplish some of their goals, as is evidenced by the fact that the policy in regard to homosexuals was changed in 1975 and that the police department will now consider hiring someone who has admitted to an occasional minor criminal violation such as smoking marijuana. The department still refuses to hire habitual offenders, however; and because of the special needs of the police department, I conclude that these regulations represent a reasonable effort to accommodate the needs of the government vis-a-vis the interests of the individual.

20. Childers contends that *Norton* and *benShalom, supra*, as well as *Society for Individual Rights, Inc. v. Hampton*, 63 F.R.D. 399 (N.D. Cal.1973), aff'd on other grounds, 528 F.2d 905 (9th Cir. 1975), support his position here. A careful reading of these cases will demonstrate, however, that in none of the cases was any substantial overt homosexual conduct involved. Each of those plaintiffs was discharged because of his homosexual preference and personality, rather than his sexual practices. While it may be argued that mere sexual preference alone is protected by the constitutional right to privacy, that question is not at issue here. Childers was not hired because of his active and frequent homosexual conduct. The police department has no policy regarding sexual preference, only sexual practice.

21. Childers clearly violated the regulations, as he admitted to habitually engaging in conduct in violation of Tex.Penal Code § 21.06. Plaintiff lived with Donald Armstrong from 1973 to 1975, and he engaged in sexual relations with Armstrong several times a week for the entire two and a half years.

22. The Court should note that Childers has also challenged the actions of the police department on equal protection grounds and as in violation of Tex.Rev.Civ.Stat.Ann. art. 6252–16. These challenges require only brief response.

Plaintiff's equal protection claims rest on two bases. First, Childers argues that his homosexual activities are protected as a fundamental right, or that homosexuals are a suspect class, and that any infringement thereof may not be upheld except upon the showing of a compelling state interest. Alternatively, Childers argues that even if the government's actions are reviewed under traditional equal protection analysis, their actions have been so irrational as to be arbitrary.

My analysis in Section IIIB of this opinion is dispositive of Childers' claim that homosexuality is protected as a fundamental right. It is also clear that Childers is not a member of a protected class. Traditionally, only those classifications based on race, religion, national origin or alienage have been considered suspect. In *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed. 583 (1973), four members of the Supreme Court found sex to be a suspect class. Since the Supreme Court has not definitely ruled that gender is a suspect class, this Court is not prepared to go even further to declare that sexual preference is a suspect class.

that homosexual behavior conflicts with the deeply ingrained moral standards of most of the community, courts have been reluctant to deal with the issues with which this Court has been confronted. I am acutely conscious of the tensions between strongly felt, conflicting moral values. This awareness, however, cannot obscure this Court's obligation to address the issues squarely in light of the Constitution. It is in this context that the rights of Steven Childers have been examined, and it is in this context that I hold that no rights of Childers have been violated. In accordance with this holding, and the reasons given above, the Court finds all the controlling issues against Plaintiff and in favor of the Defendants. The Plaintiff is not entitled to and is denied all his requested relief.

Assuming that the more usual standard of equal protection is to be applied, that standard requires only that government action be reasonably related to a legitimate government end. The actions of the police department here were not irrational, unreasonable or arbitrary, even when compared with the treatment received by other violators of the law. Plaintiff has failed to show that he has been treated differently from others similarly situated. The actions of the police department were clearly designed to further the interests of the government and were not applied in an unreasonable or discriminatory manner. The police department at all times acted in good faith and without malice toward Plaintiff. Neither the police actions or the regulations upon which they were based affront the equal protection clause. I conclude as a matter of law that Childers was not deprived of equal protection.

Childers' allegation that the police department's actions violated Tex.Rev.Civ.Stat.Ann. art. 6252–16 is frivolous. That statute protects persons from discrimination on the basis of sex. This court has found no cases, and none are cited, that even imply that the Texas legislature intended to include "sexual preference" within the definition of sex. "Sex", as used by the Texas legislature, refers to gender.