Kristine NARAGON

v.

James H. WHARTON, Ph.D., individually and in his capacity as Chancellor of the Baton Rouge Campus of the Louisiana State University, Carolyn H. Hargrave, Ph.D., individually and in her capacity as Vice-Chancellor for Academic Affairs and Provost of the Baton Rouge Campus of the Louisiana State University and Lyle C. Merriman, Ph.D., individually and in his capacity as Dean of the School of Music, Louisiana State University, Baton Rouge.

Civ. A. No. 83–905 B.

United States District Court,
M.D. Louisiana.

Sept. 30, 1983.

R. James Kellogg, New Orleans, La., for plaintiff.

W.S. McKenzie, Nancy C. Tyler, Taylor, Porter, Brooks & Phillips, Baton Rouge, La., for defendants.

E. GORDON WEST, District Judge:

Plaintiff, Kristine Naragon, is a graduate student in the School of Music at Louisiana State University at Baton Rouge, Louisiana. She is presently working on her doctorate degree. In this suit she alleges that while a graduate student, during the 1980–1981 and 1981–1982 academic years, she was employed part-time by the University as a graduate assistant. Graduate assistants may be assigned responsibilities in any of three general areas, i.e., research, teaching, or public service. Plaintiff was assigned teaching duties, assisting Dr. George Foss in teaching undergraduates a course in music appreciation. During the fall semester of 1982, Dr. Foss was on leave, and plaintiff was employed as a full-time Visiting Instructor to teach his course. For that semester she was a full-time employee of the University and not a student. In December of 1982, upon completion of her full-time employment, she was again appointed as a graduate assistant with teaching responsibilities for the spring semester of 1983. This appointment expired in May, 1983. At the beginning of the 1983–1984 academic year, she was again employed as a graduate assistant, but with research responsibilities instead of teaching responsibilities. In this suit, the plaintiff objects to this change in assignment, claiming that the change in assignment was prompted by the fact that the University learned that she is a homosexual, and that such a motivation for the change in assignment is a violation of her constitutionally protected rights. The plaintiff is apparently not sure which rights have been violated, but says "Whether we describe the defendants' actions as violative of the First Amendment (in attempting to regulate plaintiff's belief and associational interests without an adequate reason for doing so), the Equal Protection Clause (in that she was treated differently from heterosexuals similarly situated) or Due Process Clause (in that the policy allegedly violated is vague, unwritten and sporadically applied), it is clear that her rights have been violated." She seeks to have her teaching responsibilities restored. She acknowledges that in her present assignment she receives the same pay and benefits that she received when she had teaching responsibilities.

Named as defendants are James H. Wharton, Chancellor of the Baton Rouge Campus of Louisiana State University; Carolyn H. Hargrave, Vice-Chancellor of Academic Affairs and Provost; and Lyle C. Merriman, Dean of the University School of Music. (Defendants will hereafter be referred to collectively as "the University.")

All proper parties are before the Court and jurisdictional and venue requirements have been met.

The University claims that, first of all, they were under no obligation to renew plaintiff's contract as a graduate assistant because, by the very terms of the University regulations pertaining to such appointments:

"Upon expiration of a term appointment, the employee is a free agent to whom the University System has no obligation. The University System may reappoint the employee to the same or a different position. Nonreappointment carries no implication whatsoever as to the quality of the employee's work, conduct or professional competence."

Secondly, the University says that contrary to the contentions of the plaintiff, her job assignment was not changed because she is a homosexual, but because, based upon uncontroverted evidence, it was the opinion of the appointing authorities that the plaintiff had engaged in activities which were inappropriate for a person in a teaching capacity, whether such activities were those of a homosexual, a heterosexual, or a bisexual person. They concluded that the activities engaged in by the plaintiff amounted to unprofessional conduct, detrimental to the best interests of the University.

Upon trial of the case, the following facts, most of which were undisputed, were established:

Plaintiff, at the time of bringing this suit, is a 30 year old graduate student in the School of Music at Louisiana State University at Baton Rouge, Louisiana. She is currently working on her doctorate degree.

Academically she is an outstanding student, having accumulated a near perfect, if not perfect, record scholastically. While a graduate student she was employed part-time by the University as a graduate assistant during the 1980–1981 and 1981–1982 academic years. Graduate assistants may be assigned either research duties, teaching duties, or public service duties. During those years she was assigned teaching duties, assisting Dr. George Foss in teaching undergraduate courses in music appreciation.

During the fall semester of 1982, the plaintiff was employed by the University as a full-time Visiting Instructor to teach Dr. Foss's courses while he was on leave of absence. During that time she was not a student but a full-time employee of the University with teaching responsibilities. At the end of that semester, in December, 1982, when she had again become a student, she was again appointed as a graduate assistant with teaching responsibilities for the spring semester in 1983. This was a term appointment which expired in May, 1983.

Early in the fall of the 1982 semester, the plaintiff became acquainted with a 17 year old female freshman student in the School of Music, and this acquaintanceship developed into a "deep personal romantic relationship." This development occurred while the plaintiff was serving as a full-time faculty member of the Louisiana State University School of Music. The student, who by agreement of all parties will be referred to as "Jane Doe," was not a member of any class being taught by the plaintiff, but they both participated in musical activities sponsored by the School. After Miss Doe's 18th birthday on November 13, 1982, a "romantic physical relationship" developed and continued for an unspecified time.

In the late fall of 1982, Miss Doe's parents became aware of this relationship and learned that their daughter was then living with the plaintiff, who was still a full-time employee of the University with teaching responsibilities. During the Christmas holidays, apparently shortly before Christmas, Vice-Chancellor Hargrave was contacted by the student's parents, hereafter referred to as Mr. and Mrs. Doe, about this relationship. Thereafter, on December 27, 1982, Dr. Hargrave met with Mr. and Mrs. Doe. In the meantime, on December 19, 1982, an open confrontation occurred between the plaintiff and Miss Doe's parents and some student friends at a large shopping center in Baton Rouge known as Cortana Mall. While all of the details of this meeting were not clearly developed, there is no doubt but that the confrontation was related to the romantic relationship between the plaintiff and Miss Doe, and the police apparently intervened and escorted the plaintiff from the scene. Again, apparently a day or so later, another similar confrontation occurred on the campus in front of the Music School which was terminated also by police intervention. After this incident, Miss Doe went to Ohio with the plaintiff to spend the remainder of the holidays and upon her return to Baton Rouge, she continued to live with the plaintiff.

On December 27, 1982, Dr. Hargrave met with Miss Doe's parents who complained about the relationship of their daughter with a University teacher. They identified the teacher as the plaintiff and displayed letters written by the plaintiff to their daughter evidencing their relationship. Thereafter, Dr. Hargrave requested Dean Merriman of the Music School and Vice Chancellor Pesson, in charge of Student Affairs, to investigate the matter. Dean Merriman met with the plaintiff who promptly informed him that her relationship with a student who was not in one of her classes was none of the University's business. Dean Blimling, Dean of Students, also assisted in the investigation. He was aware of the problem, having previously seen the police report concerning the December 20th incident in front of the Music School. He met with Miss Doe's parents who requested University assistance in helping them become reconciled with their daughter. Dean Blimling then wrote to Miss Doe asking her to come to his office. Miss Doe responded to the letter by telephone, and after some discussion, agreed to come to his office the following day. When she arrived, about an

hour late, she was accompanied by the plaintiff who had not been requested or invited to attend. Dean Blimling tried to explain to Miss Doe the love and concern which her parents had for her and he conveyed the parents' offer to provide her with room and board on the campus and their willingness to participate in a counseling program for their mutual benefit. Dean Blimling testified that the plaintiff continually interrupted his endeavor to converse with Miss Doe and continually tried to answer questions directed at Miss Doe. Then, after stating that her relationship with Miss Doe was a private matter and no business of the University, the plaintiff announced that the meeting was over, and taking Miss Doe by the arm, escorted her out of the office.

Following this meeting, since plaintiff's appointment as a graduate assistant with teaching responsibilities had already been made for the spring semester of 1983, and after having consulted with Dr. Susan Jenson, Director of the L.S.U. Mental Health Clinic, Dean Blimling recommended to Dr. Hargrave that no change be made in the appointment for that semester. Dr. Hargrave accepted that recommendation. It was the consensus that if a change was made at that time it might further alienate Miss Doe from her parents. Before the decision was made not to change the nature of plaintiff's appointment for the spring semester of 1983, Dean Merriman consulted with nine or ten "Area Coordinators," all of whom are professors in the Music School, and it was their recommendation also that no change be made in plaintiff's assignment. It was apparently their opinion that any change in assignment made at that time might result in adverse publicity for the University. During these discussions, it was quite evident that not only the romantic relationship was discussed, but also the homosexual nature of the relationship was known to all parties.

Plaintiff served as a graduate assistant with teaching responsibilities for that entire semester, and no disciplinary action of any kind has been taken against her. No complaints concerning the plaintiff were received by the University during that semester. At the end of that semester, when plaintiff's assignment terminated, the question of a new appointment for the plaintiff for the ensuing semester came before a meeting of the Area Coordinators. Plaintiff's sexual activities were apparently again discussed, and a majority of those present felt that she should again be assigned to a teaching assistantship for the fall semester of 1983–1984 school year. None of these Area Coordinators served in administrative capacities, and they had no authority to do anything other than make recommendations in connection with the appointment of graduate assistants. Their recommendation was forwarded to Dr. Hargrave. After conferring with Vice-Presidents Sean McGlynn and Lynn Pesson, and Deans Gregory Blimling and William Cooper, all of whom hold administrative positions, Dr. Hargrave approved the reappointment of the plaintiff as a graduate assistant, for the fall semester of 1983, with the proviso that her duties would relate to research rather than teaching. Despite the fact that it was unlikely that Miss Doe, who is a music major, would ever be enrolled in a music appreciation course taught by the plaintiff, Dr. Hargrave, Vice-Presidents McGlynn and Pesson, and Deans Blimling and Cooper, all of whom share responsibilities for the ultimate appointment of graduate assistants, concluded that it would be in the best interest of the University and of the students thereof if the plaintiff served in some capacity other than as a teaching assistant. It was their opinion that a teacher at the University should serve somewhat as a role model for students as well as an instructor or teacher. It was their testimony that while they had been aware of the sexual orientation of the plaintiff, that that was not a motivation for changing her assignment. According to the testimony of Dr. Hargrave, while the University has no specific written policy concerning standards of conduct for a teacher, nevertheless it is certainly generally understood that the teacher or professor must act "professionally and with good judgment" and must not

act in such a manner as to "impede or intrude" into the teaching process. It was the feeling of those responsible for making teaching assignments that "deep, personal romantic relationships" between teachers and students should not be permitted, especially when such relationships might reflect unfavorably on the University or impede or intrude into the teaching process. They concluded that such conduct is not only contrary to the interests of the particular persons involved, but that it has a direct effect on the opinion of other students at the University, and that it could, if known, affect the opinions of other prospective students contemplating coming to the University. The situation in which the plaintiff was involved was not a secret. It had come to the attention of other students as indicated by the confrontations which occurred at the large shopping mall and on the campus at the University. There is little doubt but that the judgment of the plaintiff could easily have been called into question. The testimony in the case quite clearly shows that while those responsible for the assignment and reassignment of the plaintiff to her duties as a graduate assistant were made aware of plaintiff's homosexual tendencies, that was not the motivating factor in their decision to change her assignment. It is quite apparent from the testimony, taken as a whole, that the same change in assignment would, in all probability, have been made in the case of any mature, 29 year old teacher, who became romantically involved with a 17 year old student, whether that involvement was homosexual or heterosexual, particularly if complaints were lodged with the University about the relationship, and particularly if the relationship resulted in spectacles such as occurred publicly in this case in a large shopping mall and on the campus of the University. For the University to fail to act at the proper time in such a situation could conceivably result in serious consequences over and beyond the resulting disservice to the student and her parents. The fact that the student was not enrolled in a specific class being taught by the plaintiff, or that the plaintiff was not in a position to assign grades to the student's work, does not make the relationship between the teacher and the young student acceptable behavior. Contained in University regulations pertaining to teachers is the specific requirement that teachers should be "positive role models" for students, and should govern themselves accordingly. The regulations do not contain specifics concerning the conduct expected of teachers, but it does not seem unreasonable to suggest that by implication, at least, it should be understood by teachers and professors that "deep, personal romantic relationships" with students in the University, could reasonably be viewed by University officials as conduct which is unprofessional, and unbecoming a teacher or professor, and detrimental to the best interests of the University. As testified by Dr. Hargrave, such romantic relationship between teacher and student may give the impression of an abuse of authority; it may appear to create a conflict of interest even if in fact no such conflict directly results; it tends to create in the minds of other students a perception of unfairness; it tends to and most probably does affect other students' opinions of the teacher; it may affect other professors' opinions of the student and the teacher; and it might well affect prospective students' opinions of the University.

Activities such as were engaged in by the plaintiff and the student in this case are rarely kept as secrets. Such things become matters of general knowledge among those in the University community. The evidence left no doubt but that many students knew of the relationship between the plaintiff and Miss Doe, and of the problem that it had created between Miss Doe and her parents. The University has a right, and indeed a duty, to take all reasonable and lawful measures to prevent activities which adversely intrude into the teaching process or which might adversely affect the University's image and reputation. It has a right to expect and demand the highest standards of personal behavior and teaching performance from its teachers and professors. It does not have to settle for less.

The plaintiff stipulated that her various appointments by the University were "term" appointments and that the University was under no obligation to reappoint her as a graduate assistant. The plaintiff says that she agrees that the University could decide not to renew her appointment "for almost any reason or no reason at all, [but that] it is also true that it could not do so on the basis of race, color, gender, or other constitutionally infirm reasons." It is her position that her work assignment was changed solely because she was having a homosexual relationship with a student at the University. She claims that this amounts to a prohibited discrimination based solely upon her sexual orientation. We do not have to reach the question of whether or not a teacher's change of work assignment based solely and only on the matter of sexual orientation would be a violation of a constitutionally protected right because we find, as a fact, that such was not the case in this instance. While the University was indeed made aware of the plaintiff's sexual preferences, the evidence preponderates in favor of the conclusion that the change in her work assignment, under her new contract, was prompted by considerations much more compelling than her particular sexual preference. If her private sexual orientation had been the compelling reason for University action, it seems reasonable to assume that it would not have renewed her contract at all. It must be noted that the records of the University do not contain any statement of reasons for the assignment given plaintiff for the 1983 fall semester. There is no mention or notation of any kind that could ever appear on her transcript or work record to indicate her sexual preference or to indicate any unusual reason for her assignment as a research assistant. All indications are that such assignment was made in the ordinary course of assigning duties to graduate student assistants. No disciplinary action of any kind was ever taken or even proposed against the plaintiff. She contends that " . . . the removal of her teaching responsibilities at this point in her academic career will have a deleterious ef-fect on her future employment. . . . " It is difficult to see why this would be so any more than if the University simply refused to renew her assistantship for reasons which the plaintiff herself would consider legitimate, and made no mention of any kind as to the reasons therefor. In the present case, the only notification to future prospective employers, or for that matter, to the world in general, as to her sexual preferences, and as to the reasons for the change in assignment, i.e., lack of professionalism and good judgment exhibited in the pursuit of a romantic relationship by a teacher with a young freshman student, was made by the plaintiff herself and not by the University. The handling of the affair by the University was tactful and professional, giving every conceivable consideration to the welfare of the University, the plaintiff, and the student involved. It was a tactful and lawful solution to a delicate and difficult problem. No publicity of any kind would have been given to the incident but for the actions taken by the plaintiff herself. For this she cannot blame the University. Hence her claim that the action of the University will have a "deleterious effect" on her future career is totally without merit.

█ Plaintiff claims a violation of her First Amendment rights. Exactly which right is claimed to have been violated is not clear, but the inference is that plaintiff claims her "right to associate" has been denied. This, of course, is not so. The plaintiff's right to associate with the student involved has not been denied. No unreasonable prohibition has been placed on her private activities. It is only particular conduct on her part which is considered by her employers to be detrimental to the University and its teaching processes that has been curtailed. It was the decision of the University that a teacher should not be involved in a "deep, personal romantic relationship" with a student, whether that relationship was homosexual or heterosexual. Such action was considered to be unprofessional and detrimental to the best interest of the University. It is only that conduct

which the University has attempted to curtail by employing the plaintiff as a researcher instead of a teacher. This they had a right to do. This action by the University is the result of a "balancing of interests" as contemplated by *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968), when the Court said:

> "[T]he theory that public employment which may be·denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected.... At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."

It was this kind of "balancing of interests" that was involved in this case. As required by *Childers v. Dallas Police Department,* 513 F.Supp. 134, 669 F.2d 732 (CA5–1982), when the burden shifted to the University to show how the plaintiff's conduct constituted a material and substantial interference with the mission of the University, it successfully carried that burden. The University "balanced the interests" legally and nicely in handling the problem. It has done nothing to preclude the plaintiff from advocating gay rights; it has not interfered with her private sexual activities except as those activities materially and substantially interfere with the mission of the University; and they have taken no disciplinary action of any kind against the plaintiff. Indeed, they have re-hired her at the same salary and assigned her to meaningful duties which can be performed without detriment to the University and without interference with her own private activities, so long as those activities do not upset a proper balance of interests between her and her

employer. Such minor restrictions as may have resulted from plaintiff's change in assignment do no violence to the substantive Due Process provision of the Fourteenth Amendment. Such conditions are legitimate considerations in the employment process. See *Childers v. Dallas Police Department,* supra.

■ There is likewise no merit to the claim of denial of procedural due process. The plaintiff has conceded that she has no "property" interest in her continued employment as a teacher, and certainly she has no "liberty" interest. She has certainly not been subjected to a "badge of infamy" by any action taken by the University. She has not been denied procedural due process. See *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); *Johnson v. San Jacinto Junior College,* 498 F.Supp. 555 (S.D.Tex.) 1980; *Dennis v. S. & S. Consolidated Rural High School District,* 577 F.2d 338 (CA5–1978).

■ Lastly, the plaintiff argues that because the evidence showed that there had been two or three other known instances of romantic relationships on a heterosexual basis, between teachers and students, and no job assignment changes occurred, the action of the University in this case must be considered to be discriminatory. Such a conclusion is not mandated. Each case of teacher misconduct and its resulting effect on the mission of the University must be considered on its own. In each of the other cases cited, no complaints were filed with the University officials and no untoward incidents resulted. In the present case, angry complaints were lodged by the parents of the student involved, and both the parents and several students were directly involved publicly in at least two confrontations with the plaintiff, on and off the campus, resulting each time in police intervention. Other dissimilarities between the cited instances and the present case are apparent. The fact that the University concluded that remedial action should be taken in this case while it apparently concluded differently in the other cases simply points to the validity of the "balancing of

interests" approach to this type of problem. It does not force the conclusion that the present action was discriminatory. The Court concludes that it was not.

Counsel for the plaintiff argues to the Court that the case of *Mt. Healthy City School District v. Doyle,* 429 U.S. 274, 283–4, 97 S.Ct. 568, 574, 50 L.Ed.2d 471 (1977) sets up a tripartite examination to be followed in cases such as the case at bar. He states that the examination, under the facts of this case, must answer the following questions: "(1) was Ms. Naragan's sexual orientation a 'substantial' or 'motivating' factor in having her teaching duties removed; (2) is her sexual orientation constitutionally protected; and (3) would she have been removed notwithstanding her sexual orientation." Counsel suggests the answers to these three questions should determine the outcome of this case. In view of the evidence adduced at the trial of this case, the Court has no difficulty in answering these questions. The answer to the first question is "No." While her sexual orientation was known to all parties involved, and while it was obviously discussed in connection with her proposed reappointment, the Court is convinced, beyond a doubt, that her sexual preference was not a substantial motivating factor in her assignment as a research assistant. The answer to question No. 2 is "Not necessarily." Without deciding the broad question of whether or not sexual orientation is in all instances constitutionally protected, we conclude that first, the plaintiff's sexual orientation was not a motivating factor in her reassignment, but we further conclude that even if it was, it is highly doubtful that such constitutional protection would prohibit the action taken by the University in view of the fact that the evidence clearly shows that there was a compelling state interest which justified the actions taken by the University. The third question is a little difficult to answer. It is obvious that had the plaintiff been heterosexual, and not homosexual, a relationship between her and Miss Doe as described during the trial would be most unlikely. Suffice it to say that it is the opinion of the Court that the plaintiff was not reassigned because she was a homosexual, but because she was acting in a manner considered by the University to be unprofessional, and in a manner which the appointing authorities concluded was likely to be detrimental to the best interest of the University.

For these reasons, it is the opinion of the Court that under the circumstances of this case, the plaintiff has not been illegally discriminated against, and that none of her constitutionally protected rights have been violated by the University. Her demand for injunctive and other relief must be denied, and a judgment will be entered accordingly.