Kristine NARAGON, Plaintiff-Appellant,

v.

James H. WHARTON, Ph.D., etc., et al.,
Defendants-Appellees.

No. 83–3632.

United States Court of Appeals,
Fifth Circuit.

Aug. 6, 1984.

Goldberg, Circuit Judge, dissented with opinion.

R. James Kellogg, William P. Quigley, New Orleans, La., for plaintiff-appellant.

W.S. McKenzie, Nancy C. Tyler, Baton Rouge, La., for defendants-appellees.

Abby R. Rubenfeld, New York City, for amicus Lambda, et al.

Joan W. Howarth, Susan Douglas McGreivy, Los Angeles, Cal., for amicus A.C.L.U.

Before GOLDBERG, REAVLEY and JOHNSON, Circuit Judges.

REAVLEY, Circuit Judge:

Kristine Naragon, insisting that it is not the right, or any concern, of the Louisiana State University at Baton Rouge (LSU) to interfere with an instructor's intimate relationship with a freshman student, complains that LSU administrators violated her constitutional rights when they failed to include teaching in her duties as a graduate assistant. Naragon went to federal court seeking a declaration that her First and Fourteenth Amendment rights had been violated and an injunction to compel defendants to grant her teaching duties. After a bench trial, and with a thorough opinion, the district court rejected Naragon's claim, 572 F.Supp. 1117. We affirm.

I

Naragon came to LSU in 1980 to pursue studies for a degree of Doctor of Musical Arts. At the same time she served as a graduate assistant with responsibility for teaching a music appreciation class. Her appointment as graduate assistant was re-

newed each term until the fall of 1982 when she was appointed full time visiting instructor during the sabbatical of a music professor. She then met a 17 year old freshman music major, whom we shall call Jane Doe. Though Doe was not in a class taught by Naragon, they were in musical groups where they rehearsed and performed together. The 29 year old instructor and 17 year old freshman rapidly became very dear friends. By late November or early December Doe had moved into Naragon's home, and the relationship included physical intimacy.

When Doe's parents learned of these developments, difficulties arose. Friends of the parents went to discuss the matter with Doe at a shopping mall where she worked. Naragon appeared, whereupon an angry exchange took place which was ended by security guards who ejected Naragon and took Doe to the mall's office to await her parents. The next day Doe's father picked up her belongings at Naragon's place and told Naragon that Doe wanted no further contact with her. The following day, however, Naragon was talking to Doe at the music building when Doe's father arrived. Despite the intervention of the Dean of Music, the exchange between the father and the instructor had to be quelled by campus police. Whereupon Naragon left Baton Rouge to spend the Christmas holidays in Ohio, and Doe went along.

Doe's parents met with the LSU Vice Chancellor for Academic Affairs during the holidays and insisted that the school do something to stop the undue influence that Naragon was exercising over their daughter. Meetings of school administrators followed, and the Dean of Students was directed to speak to Jane Doe. After meeting with Doe's parents, who told him of their anxiety, he wrote to her asking her to meet with him. Later she called and they made a date to meet the following day. However, Doe arrived at the Dean's office an hour later, not alone but with Naragon. The three conferred, and Naragon controlled Doe's participation—answering questions directed at Doe, insisting that their relationship was not the University's concern, and ultimately announcing that the meeting was over as she took Doe's arm to leave.

Primarily to avoid worsening the alienation of Doe from her parents, the University allowed Naragon to continue her teaching duties during the spring 1983 term. Thereafter, she was reappointed as a graduate assistant with the same compensation, but her duties no longer included teaching undergraduates. Nothing of the reasons for the change was shown in Naragon's record.

## II

Naragon sued three University administrators to retain her teaching duties, seeking no damages but only declaratory and injunctive relief, costs, and attorney's fees. The district court rendered judgment for the defendant school officials, finding that they responded well to a difficult problem, intruding into Naragon's private life only to the least extent possible given their legitimate view that intimate relationships between teachers and students are unprofessional and likely to be detrimental to the students and to the University. 572 F.Supp. 1117 (M.D.La.1983).

Naragon persists. She argues that the real reason for her change of duties was that she is homosexual, and that denying her teaching duties for that reason is an Equal Protection violation and infringes her right to privacy as well as her First Amendment right of association.[1] However, the district court found that the University officials were motivated by consid-

1. Naragon asserts no procedural due process claim, for she concedes that her position as a graduate assistant expired at the end of each term and that LSU had no legal obligation to reappoint her. LSU could therefore have denied Naragon reappointment or changed her duties for no reason at all, but it could not do so for a constitutionally infirm reason. *Perry v. Sindermann*, 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972). Thus, our only question is whether LSU altered Naragon's duties for a constitutionally impermissible reason.

erations unrelated to Naragon's sexual preference.[2] If that be the fact, we will be required to proceed no further. There would be no need to consider, for example, whether the University would be entitled·to be more concerned and take different action in a case where a teacher becomes intimate with a 17 or 18 year old freshman of the same sex than in a case where they are of different sexes. If the reasons for the decision of the defendants were unrelated to Naragon's sexual orientation, and even unrelated to that feature of her relationship with Doe, none of the argument about Naragon's constitutional rights need be discussed.

### III

The district court found that the homosexual tendencies of Naragon was not a motivating factor in the decision of the defendants to change her assignment, and that the change in her work assignment was prompted by considerations much more compelling than her particular sexual preference. Our review of the record reveals clear support for that finding, and in nowise could we hold it to be clearly erroneous. The Vice Chancellor for Academic Affairs and Provost of LSU, the defendant who made the ultimate decision on Naragon's appointment, testified that it was Naragon's relationship with Doe that was the basis for her decision and that it was not the fact that Naragon was homosexual. The issue was drawn by this question put to the Vice Chancellor by Naragon's attorney: "What business is it of the University if a student who is above the age of majority has a relationship with anyone as long as there is not a teaching position where the person can give a grade or withhold a grade?"[3]

The Vice Chancellor responded to this inquiry and position, in the course of her testimony, by insisting that there may be an adverse effect upon the student and University, and upon the effectiveness of the teacher. In this case it appeared that Doe was confused and not thinking independently, and the breach with her parents was a serious problem. Teachers are role models, good or bad, for students. The Vice Chancellor considered intimacy between a teacher and student a breach of professional ethics on the part of the teacher, and thought·that it undermined the proper position and effectiveness of the teacher·because of the perception of other students. Furthermore, if known, conduct of this nature between teacher and student would be damaging to relations with the public and parents, both present and prospective.

The Dean of the School of Music and the Dean of Students also testified that Naragon's homosexuality was not a factor in the decision of the administration. The Dean of Music said that it is an obvious criterion for ·being a professional teacher to avoid intimate relationships with students. The Dean of Students recommended against giving Naragon teaching duties because her conduct had been unprofessional and a neglect of responsibility to students, faculty, and alumni. He explained that the role of teacher demanded that an example be set for students, and that the teacher should stand in a position of trust to instruct the student. That role, he said, Nar-

**2.** Under *Mt. Healthy School Board v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), Naragon bore the initial burden to show that constitutionally protected conduct—e.g. her homosexuality or homosexual association, as she contends—was a "substantial" or "motivating" factor in LSU's decision to change her duties. *Id.* at 287, 97 S.Ct. 576. *See Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 265–66, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). If it were established that constitutionally protected conduct was a factor, and LSU *failed to show that same decision* would have been reached if the orientation and

association were heterosexual, the action of LSU could then have been tested according to the balance established in *Pickering v. Board of Education,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

**3.** The question ignores the facts here that the relationship began, whether it reached the point of intimacy or not, while Doe was a 17 year old beginning freshman at the University and that the two were members of musical groups in which Naragon had a leadership role.

agon had compromised. Furthermore, he testified that his concern in this particular case was heightened because of Naragon's control of Doe and because of what was happening between Doe and her parents. The Vice Chancellor for Research and the Dean of the Graduate School concurred in this decision of the administration.

We would be very reluctant to reject the reasoning of these educators or to overrule their decision. All that can be said for a contrary view of the motivation of defendants is that they knew of the homosexual orientation of Naragon and that the Dean of Music had heard of a heterosexual relationship between a teacher and a student which brought no sanction. The Dean surmised that the fact the student had been married earlier, that her parents were aware of the relationship, and that no complaints were made may have borne on the different consequences there.

This is not a case where authorities automatically reacted out of personal prejudice. They reappointed Naragon with full teaching duties after they knew of her homosexuality and tried to act so as to avoid further damage between the student and her parents. The facts were explored. Naragon's influence over Doe, and her insistence that the whole affair was entirely proper within the scope of University interest, were verified. Then Naragon was given another appointment with the same pay, and no entry on the record was made or verbal criticism spread abroad to impair her reputation or future career. We could not possibly disagree with the finding and decision of the district judge in this case.

AFFIRMED.

GOLDBERG, Circuit Judge, dissenting:

Today's majority, like the trial court below, seemingly does not want to hear the clamoring of the difficult and extremely important legal issue raised by this case. The majority proclaims that the record contains solid support for the district court's finding that Ms. Naragon's homosexuality was not a motivating factor in her reassignment. I perceive, however, a critical and inescapable flaw in that support. With all due respect to the wise and sagacious judge writing for the majority, my review of the record leaves me with the "definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

My quarrel with the majority's result does not flow from my disbelief of testimony offered by the defendants. University administrators testified that neither Ms. Naragon's homosexuality nor the homosexual nature of her relationship with Ms. Doe were relevant to administrators' personal opinions regarding whether Ms. Naragon was conducting herself "professionally" and as a proper "role-model." I could hardly hold the district court clearly erroneous based on its decision to credit the testimony of the defendants over that of the plaintiff on the issue of the defendants' own subjective motivations. But that fact alone cannot end the inquiry into whether Ms. Naragon's sexual preference was a motivating factor in her reassignment. Our equal protection jurisprudence demands a more exacting search for bias when questions of unequal treatment are at issue.

The record contains uncontroverted evidence that the complaints of Ms. Doe's parents constituted a central factor in the University's decision to take action. Specifically, Vice Chancellor Hargrave's testimony suggested that Ms. Naragon would not have lost her teaching responsibilities *but for* the parents' complaints.[1] Dean

---

1. Q. Dr. Hargrave, it is true, is it not, that a number of the people in the current administration and in previous administrations have had relationships with other members of the teaching faculty?

A. I don't—I'm not certain what you're asking. What?

Q. Focusing on relations between—I'm trying to determine the extent of the policy, I understood you to be broadening it to also include administrator personnel who are also members of the faculty, if there was any prohibition of policy between administration—members of the administration having relations with

Merriman also painted the parents' complaint as a major element in the reassignment. When questioned by plaintiff's counsel, he admitted that a previous heterosexual student-teacher relationship within the Music Department had brought no sanctions against the faculty member involved. This was true despite general knowledge of the relationship among faculty members and despite the fact that the teacher was actually living with a student over whom he had grading responsibility. Transcript, p. 97–98. In explaining why the University took no action in the heterosexual relationship but did in Ms. Naragon's case, Dean Merriman relied upon, among other factors, the complaint of Ms. Doe's parents. Transcript, p. 101. Indeed, the record, the findings of the trial court,[2] and the majority opinion[3] all converge to support the conclusion that the concerns and actions of Ms. Doe's parents constituted a motivating factor in plaintiff's reassignment.

Moreover, it is impossible to read this record and conclude anything other than that the parents' opposition to the relationship centered significantly upon the relationship's homosexual aspect. In describing the parents' initial complaint to the University, Vice Chancellor Hargrave said, "they were concerned about homosexual activity with their daughter."[4] Plaintiff described a particular public confrontation with Ms. Doe's parents.

> Well [it included] any nasty phrase you can think of dealing with homosexuali-

ty—I mean people were screaming I was the devil, the work of the devil, that I was going to hell, everybody else was going to hell, that I was ruining this person, that I was a homosexual prostitute, that I was enlisting people to be homosexual, and that was being screamed loudly in front of everyone at the mall.

Transcript, p. 82. Professor Patterson of the Music School characterized the controversy regarding the relationship as follows: "Mr. Doe, John Doe, the father of the female student, Jane Doe, who I believe was a freshman, had accused Ms. Naragon, a graduate assistant in music, of having a homosexual relationship with his daughter; and he wanted her assistantship taken from her." Transcript, p. 62.

In past cases where equal protection concerns have been raised, the Supreme Court has repeatedly refused to accept public or individual hostility to a protected group as justifying governmental actions against the group. In a recent case, the Supreme Court held that a state judge could not consider the real world existence of racial prejudice in deciding whether a child should be taken from its white mother who was living with a black man. *Palmore v. Sidoti*, — U.S. —, 104 S.Ct. 1879, 80 L.Ed.2d 421 (1984). The Court held that despite the state's duty to protect minor children, "private biases and the possible injury they might inflict" are not permissible considerations. Chief Justice Burger, writing for a unanimous court, held that the "Constitu-

---

members of the teaching faculty, and you said yes, if it impeded the instructional process.
    A. Yes, and if it was brought to my attention that it was impeding the instructional—if it was brought to my attention that there were problems, I would certainly look into it.
    Q. The only time you would look at it is if there was a complaint being made?
    A. That's right. We're not going out looking. We assume the high standards of our faculty....
Transcript, p. 36.

**2.** The findings of the trial court below confirm the centrality of the parents' complaints in bringing about the reassignment. The trial court declared that "the same change in assignment would, in all probability, have been made

in the case of any mature, 29 year-old teacher, who became romantically involved with a 17 year-old student, whether the involvement was homosexual or heterosexual, particularly if complaints were lodged with the University about the relationship, and particularly if the relationship resulted in spectacles [with the student's parents] such as occurred publicly in this case ...."

**3.** Majority Opinion, pp. 1405–1406.

**4.** Vice Chancellor Hargrave testified later that the parents were also concerned that their daughter was not "thinking independently." Transcript, p. 37.

tion cannot control [private] biases but neither can it tolerate them. Private biases may be outside the reach of *the law,* but the *law cannot, directly or indirectly give them effect." Id.* at ——, 104 S.Ct. at 1882 (emphasis added).

The University's consideration of pressure from Mr. and Mrs. Doe unavoidably infects the school's action with the biases of the parents. The goal of harmony with the parents of University is a laudable one, but so were the goals of avoiding "interracial disturbances, violence, riots, and community confusion," *Watson v. City of Memphis,* 373 U.S. 526, 535, 83 S.Ct. 1314, 1319, 10 L.Ed.2d 529 (1963), and avoiding the "possibility of disorder" *Wright v. Georgia,* 373 U.S. 284, 293, 83 S.Ct. 1240, 1246, 10 L.Ed.2d 349 (1963), advanced by state officials in explaining discriminatory treatment of blacks. I have little doubt that this Court would have difficulty in finding a causative link to discrimination if this case involved a black teacher and parents who objected to the interracial aspect of the teacher's relationship with their daughter. In such a case, this Court, like the Supreme Court in *Watson, supra,* and *Wright, supra,* surely would not ignore the claim of discrimination. On this basis, I would hold that the trial judge below was clearly erroneous in his finding that Ms. Naragon's sexual preference was not a motivating factor in her reassignment.

A very simple objection underlies my dissent today. The majority has refused to acknowledge a legal question which I believe is plainly presented. The extent to which the Equal Protection Clause of the Fourteenth Amendment prohibits or circumscribes discrimination based upon an individual's sexual preference is a largely unresolved, yet immensely important legal issue of our day.[5] But the obvious role of private biases in the University's action does not ring loudly enough in the majority's ears to attract their attention. I will not put a maxim silencer on the validated cries of discrimination and the calls to this

Court for constitutional justice. Because the majority does not address what I believe is an unavoidable equal protection concern in this case, I must respectfully dissent.

---

**5.** See Karst, "The Freedom of Intimate Association", 89 *Yale L.J.* 624, 682–86 (1980); L. Tribe, *American Constitutional Law,* 944–45 n. 17 (1978).