United States Court of Appeals,

Eleventh Circuit.

No. 93-9345.

Robin Joy SHAHAR, Plaintiff-Appellant,

v.

Michael J. BOWERS, Individually and in His Official Capacity as
Attorney General of the State of Georgia, Defendant-Appellee.

Dec. 20, 1995.

Opinion of Kravitch, Circuit Judge

Appeal from the United States District Court for the Northern
District of Georgia. (No. 1:91-cv-2397-RCF), Richard C. Freeman,
Senior District Judge.

Before KRAVITCH, Circuit Judge, and GODBOLD and MORGAN, Senior
Circuit Judges.

GODBOLD, Senior Circuit Judge:

The appellant Robin Joy Shahar is a homosexual female who was
offered employment with the Department of Law of the State of
Georgia to begin at a future date. She accepted the offer, but
before the employment began she made known her plans to engage in
a marriage ceremony with her female companion. The Attorney
General of Georgia, who has ultimate responsibility for hiring and
employment practices of the Department of Law, learned of her plans
and, before the marriage ceremony took place, terminated the offer
of employment.

Shahar sued the Attorney General under 42 U.S.C. § 1983,
alleging violation of her rights of intimate association, of her
freedom of religion, and of equal protection and substantive due
process. She sought declaratory and injunctive relief, including
placement as a staff attorney in the Department and compensatory

and punitive damages from the defendant in his individual capacity. The district court denied plaintiff's motion for summary judgment and granted defendant's motion for summary judgment.

The court unanimously agrees to affirm the conclusion of the district court that Shahar's right of intimate association was burdened. The court holds, however, Judge Kravitch dissenting, that the district court erred in applying a balancing test to determine whether Shahar's rights under the Constitution were violated and that the case must be remanded to the district court for it to consider these issues under a strict scrutiny standard.[1]

The court affirms the summary judgment for the Attorney General on Shahar's free expression and equal protection claims for reasons set out by Judges Kravitch and Morgan in their separate opinions. Judge Godbold disagrees with these affirmances.

Shahar's claim of violation of substantive due process is not substantially presented on appeal. All judges agree that summary judgment for the defendant on that claim must be affirmed.

Shahar, then known as Robin Brown, worked as a law clerk in the Department of Law during the summer of 1990. During her clerkship she told other clerks that she was a lesbian. She talked with Mary Beth Westmoreland, an attorney with the Department, explained the relationship with her partner, Francine Greenfield, and discussed whether it would be appropriate to bring Greenfield to a picnic to be given by the departmental division in which

---

[1]Since the district court granted summary judgment for Bowers on all claims it did not address his assertion of qualified immunity. If, on remand, Shahar reasserts claims for monetary damages, then that issue would have to be addressed.

Shahar was working.  Westmoreland discouraged the proposal, and Shahar did not bring Greenfield to the picnic.

In September 1990 defendant offered Shahar a permanent position as a Department attorney to commence in the fall of 1991, and she accepted.  She had been a Phi Beta Kappa as an undergraduate.  She graduated from Emory Law School in the spring of 1991 with an outstanding academic record (sixth in her class academically), as an editor of the law review, and the recipient of a distinguished scholarship.

In the fall of 1990, following her acceptance, Shahar completed a standard personnel form of the Department.  In the "Family Status" section she showed her "Marital Status" as "Engaged."  In response to "Spouse" she added the word "Future" and inserted the name of Francine M. Greenfield.  She identified her "Future Spouse's Occupation" as an employee of a department of the State of Georgia, her purpose being to reveal that Greenfield was employed by the State.  The Department received the form and filed it without fully reviewing it.

In June of 1991, by telephone, Shahar discussed with Deputy Attorney General Bob Coleman her upcoming employment.  He asked whether she could begin work in mid-September, and she responded that she would prefer to begin work later in the month in light of her upcoming wedding.  Shahar did not tell Coleman that she planned marriage to another woman but did state that she would be changing her last name from Brown to Shahar.  Coleman mentioned Shahar's upcoming wedding to Senior Assistant Attorney General Jeffrey Milsteen, who subsequently learned from Susan Rutherford, a

Department attorney, that plaintiff's planned wedding would be to another woman.  Rutherford and another Department employee had seen Shahar in a restaurant in the spring of 1991, and Shahar told them that she and her female dinner companion were preparing for their upcoming wedding.

Attorney General Bowers learned that the planned wedding was to another woman.  He discussed the matter with his staff. Information conveyed to him included Shahar's personnel form, Coleman's description of his telephone conversation with Shahar, information concerning the restaurant encounter between Rutherford and Shahar, information of unspecified origin that Shahar planned to send or already had sent invitations to the ceremony and that some staff of the Department of Law were on the invitation list, and other information that, as the Attorney General described it, the planned ceremony would be "a big or church wedding, I don't remember which."  The Attorney General talked with a female Jewish member of his staff, who told him the wedding was to be performed by a rabbi from New York who performed homosexual marriages but that "she was not aware of homosexual marriages or gay and lesbian marriages being recognized in Judaism."

The Attorney General wrote to Shahar on July 9, withdrawing the offer of employment.  The letter said in part:

> This action has become necessary in light of information which has only recently come to my attention relating to a purported marriage between you and another woman.  As the chief legal officer of this state inaction on my part would constitute tacit approval of this purported marriage and jeopardize the proper function of this office.

Before the wedding Brown and Greenfield changed their names to Shahar, which refers to being in a search for God.

On July 28 a rabbi performed a Jewish marriage ceremony for the couple, conducted in a state park in South Carolina. This suit was filed in October 1991.

## I. The District Court's Findings

With respect to interference with intimate association, the court defined the relevant association as Shahar's relationship with her lesbian partner whom she intended to marry. It declined to decide whether this associational relationship fell within the definition of traditional family relationships described in *Roberts v. U.S. Jaycees,* 468 U.S. 609, 619-20, 104 S.Ct. 3244, 3250-51, 82 L.Ed.2d 462 (1984). It decided instead that it was within the "broad range of [constitutionally protected] human relationships" that *Roberts* described as falling between familial relationships and associations such as large business enterprises. *Id.* at 620, 104 S.Ct. at 3250.

The court then found, based on undisputed facts, and applying the balancing test of *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), that the defendant's articulated and unrebutted concerns regarding Shahar's employment outweighed her interests in the intimate association with her female partner. The court did not address Shahar's expressive association claim because it felt that it overlapped her free exercise claim and required no greater constitutional protection than her intimate association claim.

With respect to free exercise, the court assumed without deciding that defendant indirectly burdened Shahar's right to freely exercise her religion, but again it applied *Pickering*

because it said it found no other controlling guideline, and it held that any burden suffered by Shahar was justified in light of the unique governmental concerns involved in efficient operation of the Department.

As to equal protection, Shahar contended that by withdrawing the offer of employment the defendant acted with intent to discriminate against her on the basis of her sexual orientation. The court held that defendant's classification, if any, was not based upon mere sexual orientation. It also found that, even if Shahar could establish that defendant acted in part based upon a general classification of plaintiff as a homosexual, she had not presented sufficient facts to raise a genuine issue of fact whether defendant acted with an impermissible intent to discriminate.

As to substantive due process, the court granted summary judgment because plaintiff conceded that she had no property interest in the promised employment and made no showing of deprivation of any liberty interest.

## II. The Contours of Intimate Association

Shahar's position is that the district court correctly found that her intimate association was constitutionally protected but erred in applying the *Pickering* balancing test. The Attorney General's position is that the district court erred in finding that Shahar's association was constitutionally protected, but, if it was, the court correctly applied *Pickering* to find Shahar's associational interests were outweighed by the interests of the Attorney General.

The Attorney General treats the "marriage" planned by Shahar

as a civil status governed by Georgia law, though Georgia law neither expressly forbids nor expressly authorizes same-sex marriage.[2] Georgia's statutory scheme, and its case law governing common-law marriages, repeatedly embrace the concept of marriage as being between persons of different genders.

Almost unanimously American cases have held that same-sex couples are not constitutionally entitled to attain the legal and civil status of marriage by obtaining a marriage license and complying with other requirements of the law of the jurisdiction. *Dean v. District of Columbia,* Civil Act. No. 90-13892, 1992 WL 685364 (D.C.Super.Ct. June 2, 1992), *aff'd,* 653 A.2d 307 (D.C.Ct.App.1995); *De Santo v. Barnsley,* 328 Pa.Super. 181, 476 A.2d 952 (1984) (common law marriage); *Singer v. Hara,* 11 Wash.App. 247, 522 P.2d 1187 (1974); *Jones v. Hallahan,* 501 S.W.2d 588 (Ky.1973); *Baker v. Nelson,* 291 Minn. 310, 191 N.W.2d 185 (1971), *appeal dismissed,* 409 U.S. 810, 93 S.Ct. 37, 34 L.Ed.2d 65 (1972). *See also Adams v. Howerton,* 673 F.2d 1036 (9th Cir.) (whether or not valid under state law, marriage of two males does not confer spousal status under Federal Immigration Act), *cert. denied,* 458 U.S. 1111, 102 S.Ct. 3494, 73 L.Ed.2d 1373 (1982). Some cases state that marriage is inherently a relationship between persons of different genders and cannot have application to a same-sex couple. *Singer,* 522 P.2d 1187; *Jones,* 501 S.W.2d 588.

---

[2]The record does not show that the Attorney General knew, or inquired, where the ceremony would take place. Neither party has explored the law of South Carolina, where the wedding occurred, or considered what impact, if any, it might have on this case. Thus we focus on Georgia law, which both parties consider relevant.

The Supreme Court of Hawaii, however, has held that restricting marital relation to male and female establishes a sex-based classification subject to a strict scrutiny test in a state equal protection challenge. *Baehr v. Lewin,* 74 Haw. 530, 852 P.2d 44 (1993).

Shahar did not assert when her job commitment was terminated, and has not asserted in this suit, that either the ceremony she planned or the status created by it was a Georgia civil marriage. Shahar does not assert that she desires or has sought a marriage license. She does not question the constitutionality of the Georgia licensing statute or any other of the provisions of Georgia law that speak in terms of marriage as a ceremony, and as a status, between persons of different sexes. Nor does she question the validity of Georgia principles of common law marriages.

What Shahar claims is that she proposed to—and did—engage in a Jewish religious ceremony that is recognized as a marriage ceremony by the branch of Judaism to which she adheres; that this conferred upon her and her partner a religious-based status that is apart from and independent of civil marriage as provided by Georgia law; and that she can accept, describe, and hold out both the ceremonial event and the status created by it by using the term "marriage." In ¶ 1 of her amended complaint Shahar alleged that she was "fired" because of her participation "in a private religious ceremony of marriage." The rabbi performed a "Jewish marriage ceremony," ¶ 7, followed by "a weekend celebration of Jewish marriage," a "private religious marriage ceremony," ¶ 8. Plaintiff and her partner considered their "planned religious

marriage" an important event, ¶ 9.  Shahar has disclaimed any claim of "civil" or "legal" marriage pursuant to Georgia law.  Her amended complaint alleged:

> 10. Plaintiff does not believe and has at no time represented either that her religious union with her partner carries with it any legal rights or that it constitutes a legal (civil) marriage.  The ceremony was of a purely religious nature.

The intimate association Shahar asserts is not based upon false or sham assertions of religious belief, or hasty decision, or overnight conversion.  She and her partner grew up in traditional Jewish families.  Shahar attended Hebrew school from the third grade.  She was bat mitzvahed at age 13 and continued in Hebrew school until she was confirmed at age 16.  Greenfield grew up in a conservative, kosher, Jewish home.  She went through Jewish training through high school, attended Jewish summer camps, and was involved in Jewish youth groups.

Shahar and Greenfield have been significant participants in the life of their synagogue, located in Atlanta.  It is affiliated with the Reconstructionist Movement, one of several movements within Judaism.  The synagogue serves gays, lesbians, and heterosexuals.  The Reconstructionist Movement is regarded as liberal in some respects but is conservative in others.  Shahar has led services at the synagogue and has given several sermons.  She and Greenfield often attend together.  The proposed ceremony was announced at a service of the synagogue.

Their rabbi, Sharon Kleinbaum, counseled them in eight or nine formal premarital sessions and many informal ones. Rabbi Kleinbaum described the manner in which she satisfied herself of their commitment to the Jewish faith.  She discussed with them "the

seriousness of their commitment to the Jewish issues as well as to each other, and anything related to wedding ceremonies in general that, as a Rabbi, I would do." Dep. p. 82. Continuing, she said, "I discussed with them the nature of their home life and the significance of Jewish practices to them and how it was inconceivable to them to do any kind of ceremony that was not a Jewish one." *Id*. at 83. Rabbi Kleinbaum considers that the union in which they joined is a public affirmation of their commitment to each other and to the Jewish people, having no legal significance but only personal and religious significance, and that it can be terminated only by the church.

The evidence demonstrates without dispute that same-sex marriage is accepted within the Reconstructionist Movement of Judaism, that Shahar and her partner are committed to that belief, and that, in keeping with their Jewish principles, they carefully and thoughtfully prepared for marriage.

The district judge had before him the depositions of three Jewish rabbis. Rabbi Kleinbaum, who performed the ceremony, formerly was associated with the Reconstructionist synagogue in Atlanta and has become rabbi of a New York synagogue which has the largest number of gay and lesbian attendants of any synagogue in the United States. A second rabbi who testified is the president of the National Organization of Rabbis of Reconstructionist Congregations. A third is a well-known rabbi from the Conservative Movement of Judaism. Fairly stated, the depositions do not demonstrate significant differences of fact but do reveal that Judaism in the United States does not have a monolithic view of

same-sex marriages. The Reconstructionist Movement accepts the concept of same-sex marriage and many rabbis within the Movement perform such marriages. The Reconstructionists are working on a manual that will help guide rabbis performing same-sex marriages. Other Movements in Judaism reject same-sex marriages. Still other Movements are divided in view, with some rabbis performing such marriages and others declining to do so. But the critical facts that emerge are that Shahar and her partner are lifelong adherents to Judaism and good-faith, dedicated participants in the Reconstructionist Movement; the Reconstructionist Movement is a significant movement within American Judaism; and it regards same-sex marriages as acceptable and desirable in preference to couples living together without marriage.

The actual ceremony between Shahar and Greenfield occurred after her job commitment was terminated. But it is relevant to her claim that her association has religious basis and status. The ceremony was the culmination of a weekend of religious-centered activities. Approximately 150 family and friends were invited and approximately 100 attended. Events began Friday evening with the celebration of the Hebrew Sabbath, which extends from Friday evening to Saturday evening. The wedding occurred on Sunday. Essentially the ceremony followed a traditional ceremony for a heterosexual Jewish couple except for deletion of the terms "bride" and "groom." It took place beneath a traditional huppah, or canopy. The couple signed a traditional Kutubah, or written marriage contract. They exchanged rings in traditional fashion. The traditional glass was broken. The traditional seven blessings

were given, done in Hebrew and in English. Rabbi Kleinbaum was dressed in traditional garb. She described the event as a "Jewish religious ceremony," as a "Jewish marriage," and as a "Jewish wedding."

The Attorney General states his position this way:

> The Attorney General did not withdraw Shahar's offer of employment because of her association, religious or otherwise, with other homosexuals or her female partner, but rather because she invoked the civil and legal significance of being "married" to another woman. Shahar is still free to associate with her female partner, as well as other homosexuals, for religious and other purposes.

Brief, p. 35. But he did not submit substantial evidence tending to show that Shahar "invoked the civil and legal significance of being "married' to another woman." Shahar and Greenfield have been companions for several years. They jointly own the house in which they live, but their joint ownership began several years before this case arose and, in any event, joint ownership is not limited to persons married pursuant to Georgia civil law. [3] The couple benefit from an insurance rate (presumably on household or automobile insurance) lower than that available to single women. But, under the undisputed evidence, Shahar talked to the insurance agent, explained that she was going to undergo a religious ceremony with her female partner, described and explained the ceremony, and asked if the company would consider giving them the rate available to married women, and the company agreed to do so.

The intimate relationship between Shahar and her partner whom she planned to marry did not involve marriage in a civil, legal sense but it was inextricably entwined with Shahar's exercise of

---

[3] O.C.G.A. §§ 44-6-120 & 44-6-190.

her religious beliefs.  The court holds that the district court did not err in defining that intimate relationship as constitutionally protected.[4]

### III. Scope of Review of Intimate Association

The district court used the *Pickering* balancing test.  The court holds, Judge Kravitch dissenting, that strict scrutiny must be utilized.

The difficulty of identifying a correct standard of review is demonstrated by the lengthy analysis in *McCabe v. Sharrett,* 12 F.3d 1558 (11th Cir.1994) (noting three possible standards—*Pickering, Elrod-Branti,* and strict scrutiny).  *Pickering* arose in the context of free speech, and the line of cases following it have applied most often to those involving freedom of speech or expressive association, and they give somewhat more deference to the employer.  The *Elrod*[5] and *Branti*[6] line of cases are variants of strict scrutiny that focus on the effects of political beliefs on the job performance of public employees and have not been applied outside of the political patronage context.  *See McCabe,* 12 F.3d at 1567.

The court believes that the general standard of strict scrutiny is applicable to Shahar's intimate association claim and that the acts of the Attorney General must be deemed to infringe on

---

[4]Neither the Supreme Court nor any circuit court has held that an association based solely upon the sexual orientation of a same-sex couple is an intimate association having constitutional protection.  The district court has not so held in this case and neither do we.

[5]*Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

[6]*Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

Shahar's rights unless shown to be narrowly tailored to serve a compelling governmental interest. Shahar was not engaged in political commentary. Marriage in the conventional sense is an intimate association significant burdens on which are subject to strict scrutiny. *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978). Though the religious-based marriage in which Shahar participated was not marriage in a civil, legal sense it was intimate and highly personal in the sense of affection, commitment, and permanency and, as we have spelled out, it was inextricably entwined with Shahar's exercise of her religious beliefs. Strong deference must be given to her interests and less to the employer's interest than in a *Pickering*-type case.

## IV. Expressive Association

Shahar also asserts that Bowers violated her right to expressive association. Opening Brief, 36 n. 7; Reply Brief, 12 n. 6. Expressive association is the "right to associate for the purpose of engaging in those activities protected by the First Amendment ... [, including] the exercise of religion." *Roberts,* 468 U.S. at 618, 104 S.Ct. at 3249. The right of expressive association may be limited by regulations which serve a compelling state interest. *Id.* at 623, 104 S.Ct. at 3252 ("Infringements on [the right to expressive association] may be justified by regulations adopted to serve compelling state interests, unrelated to the suppression of ideas, that cannot be achieved through means significantly less restrictive of associational freedoms."). *See also Board of Directors of Rotary Int'l v. Rotary Club of Duarte,* 481 U.S. 537, 549, 107 S.Ct. 1940, 1948, 95 L.Ed.2d 474 (1987)

("Even if the Unruh Act does work some slight infringement on Rotary members' right of expressive association, that infringement is justified because it serves the State's compelling interest in eliminating discrimination against women.").[7]  The district court did not address Shahar's expressive association claim because of its overlap with her free exercise claim and the court's conclusion that her expressive association claim required no greater constitutional protection than her intimate association claim.  The court, Judge Kravitch dissenting, remands this claim for consideration by the district court under the compelling interest test.

## V. Freedom of Religion

The district court applied the balancing test of *Pickering* to Shahar's free exercise claim after considering the restrictions placed by *Employment Div., Dep't of Human Resources v. Smith,* 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990), on the traditional compelling interest test articulated in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). *Smith* had sharply criticized *Sherbert* and essentially limited it to the unemployment benefits context.  494 U.S. at 883-85, 110 S.Ct. at 1602-04.

For reasons set out in Part II, the writer would hold that Shahar asserted a free exercise claim and would remand this claim

---

[7]This court instructed a district court to apply the *Pickering* balancing test in a similar expressive association claim, *Hatcher v. Board of Pub. Educ. & Orphanage,* 809 F.2d 1546, 1559 & n. 26 (11th Cir.1987).  But the Supreme Court applied the compelling interest test in *Rotary,* which was decided subsequent to *Hatcher.*

to the district court for it to reconsider under the compelling interest test.  Judges Kravitch and Morgan do not agree with this view.

## VI. Equal Protection

Federal courts have concluded that homosexuals, as a class, do not receive heightened scrutiny when their equal protection claims are analyzed, and accordingly, the courts have applied the rational basis test to such claims.  *See, e.g., Equality Found. of Greater Cincinnati, Inc. v. City of Cincinnati,* 54 F.3d 261, 266 n. 2 (1995) (amendment to city charter denying special status and legal protection based on sexual orientation); *Jantz v. Muci,* 976 F.2d 623, 630 (10th Cir.1992) (applicant for public high school teacher and coach position), *cert. denied,* --- U.S. ----, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993); *Ben-Shalom v. Marsh,* 881 F.2d 454, 464 (7th Cir.1989) (U.S. Army Reserves sergeant), *cert. denied,* 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); *Padula v. Webster,* 822 F.2d 97, 103 (D.C.Cir.1987) (applicant for FBI special agent).  *But see Watkins v. U.S. Army,* 875 F.2d 699, 728 (9th Cir.1989) (en banc) (Norris, J., concurring in judgment and declaring homosexuals to be a suspect class), *cert. denied,* 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990).  The writer would hold that the court need not consider whether homosexuals are, by that status alone, a class deserving a heightened scrutiny when alleging violations of the equal protection clause because, without the court's making that determination, the facts of this case require the application of strict scrutiny to Shahar's equal protection claim.

Shahar's classification or characterization is not that of homosexuality alone. Rather she is a homosexual engaging in the exercise of her religious faith, including her religious ceremony of marriage and her right to accept, describe and hold out the event and the status created by it by using the term "marriage." "[W]here a constitutional "fundamental right' is assaulted by operation of [a government regulation], ... the enactment "will be sustained only if [it is] suitably tailored to serve a compelling state interest.' " *Equality Found.,* 54 F.3d at 266 (quoting *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)). *Cf. San Antonio Indep. Sch. Dist. v. Rodriguez,* 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16 (1973) (Court disagreed with respondents' contention that education was a fundamental right and held that rational basis review applied); *Price v. Tanner,* 855 F.2d 820, 823 n. 7 (11th Cir.1988) (because the appellant did not allege the existence of a suspect class or burdened fundamental right, strict scrutiny would not apply), *cert. denied,* 489 U.S. 1081, 109 S.Ct. 1534, 103 L.Ed.2d 839 (1989); *Tarter v. James,* 667 F.2d 964, 969 (11th Cir.1982) (no fundamental right was involved, so rational basis review applied). *See also* Laurence H. Tribe, *American Constitutional Law* §§ 16-7—16-11, § 16-12 at 1464 (2d ed. 1988) ("[E]qual protection analysis demands strict scrutiny ... of classifications that penalize rights already established as fundamental for reasons unrelated to equality....."); John E. Nowak & Ronald D. Rotunda, *Constitutional Law* § 14.3 (4th ed. 1991).

The Supreme Court has used equal protection analysis, and a

strict scrutiny standard, to consider state legislation that allegedly burdened individuals' right to marry, *Zablocki v. Redhail,* 434 U.S. 374, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) (statute forbidding marriage by any person with minor children not in his/her custody and which the person is under obligation by court order to support); *Loving v. Virginia,* 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967) (statute forbidding miscegenation); right to procreate, *Skinner v. Oklahoma,* 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (habitual criminals subjected to sterilization); right to travel, *Memorial Hosp. v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (residency requirement for indigents in order to receive non-emergency medical care); *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972) (residency requirements for voting); *Shapiro v. Thompson,* 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) (residency requirements for welfare recipients); and right to vote,*Dunn,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (residency requirements for voting); *Kramer v. Union Free Sch. Dist.,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (those without children in the school system or who did not own or lease taxable property were ineligible to vote in school district elections). *Cf. Sosna v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975) (appearing to apply a strict scrutiny standard but deciding that state interests override the individual's interest where state law required residency for at least one year prior to petitioning for divorce).

The writer, Judges Kravitch and Morgan disagreeing, would remand the equal protection claim to the district court for

analysis under the strict scrutiny standard.

## VII. Mandate of the Court

The decision of the district court that Shahar's intimate association rights were violated is AFFIRMED. The summary judgment for defendant on this claim is VACATED and it is REMANDED to the district court for it to determine under a strict scrutiny standard whether this violation infringed Shahar's constitutional rights. The claim of violation of expressive association may be addressed by the district court on remand.

Summary judgment for the defendant on the free exercise, equal protection, and substantive due process claims is AFFIRMED.

MORGAN, Senior Circuit Judge, concurring in part and concurring in result:

I concur in parts II, III, and IV of Judge Godbold's opinion which hold that Shahar's rights of intimate and expressive association have been burdened and that strict scrutiny is the proper test to apply. For this reason, it is necessary to remand the case to the district court. Nevertheless, I respectfully disagree with Judge Godbold that the facts underlying Shahar's association claims necessarily translate into a Free Exercise claim that requires strict scrutiny. Thus, I do not join in Part V of his opinion.

Furthermore, I disagree with Part VI of Judge Godbold's opinion as it pertains to Shahar's Equal Protection claim. Generally, the Equal Protection Clause of the Constitution requires that a state classification be rationally related to a legitimate state interest. *Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992); *Panama City Medical Diagnostic*

*Ltd.,* 13 F.3d 1541, 1545 (11th Cir.)., *reh. denied* 21 F.3d 1127 (11th Cir.), *cert. denied,* --- U.S. ----, 115 S.Ct. 93, 130 L.Ed.2d 44 (1994). A rational basis will not suffice, however, in cases involving either a suspect class or a fundamental right. *Kadrmas v. Dickinson Pub. Schools,* 487 U.S. 450, 457-58, 108 S.Ct. 2481, 2487-88, 101 L.Ed.2d 399 (1988); *Panama City,* 13 F.3d at 1545. In such a case, the strict scrutiny test must be applied. Many courts include religion as a classification or fundamental right that deserves strict scrutiny. *See Droz v. Commissioner of I.R.S.,* 48 F.3d 1120, 1125 (9th Cir.1995) (discussing equal protection under the Fifth Amendment); *Steffan v. Perry,* 41 F.3d 677, 689 n. 9 (D.C.Cir.1994); *Olsen v. Commissioner,* 709 F.2d 278, 283 (4th Cir.1983) (discussing equal protection under the Fifth Amendment); *Seoane v. Ortho Pharmaceuticals, Inc.,* 660 F.2d 146, 149 (5th Cir.1981); *see also Johnson v. Robison,* 415 U.S. 361, 375 n. 14, 94 S.Ct. 1160, 1169 n. 14, 39 L.Ed.2d 389 (1974) (noting that the free exercise of religion is a fundamental right under the Constitution). Judge Godbold's opinion is based upon the argument that Shahar has an Equal Protection claim due to her fundamental right to exercise her religious beliefs. I believe this to be a mistake. Shahar has not brought before us an Equal Protection claim based on a fundamental religious right. Instead, as Judge Kravitch points out in her opinion, Shahar is arguing her homosexuality as a suspect class.[1] Thus, since Shahar has failed

---

[1]The portion of Shahar's appellate brief discussing Equal Protection makes numerous references to a homosexual classification claim, but it is devoid of any reference to a religious fundamental rights claim. *See, e.g.,* Appellant's Brief (filed May 13, 1994) at 42 ("Shahar's equal protection claim

to raise religion as an issue with respect to her Equal Protection claim, I join with Judge Kravitch in affirming that portion of the district court's order.[2]

Turning to Shahar's contention that her homosexuality entitles her to the designation of being in a suspect class, I note that such an argument has been universally rejected by the courts that have considered it. *See, e.g., Equality Found. of Greater Cincinnati, Inc. v. City of Cincinnati,* 54 F.3d 261 (6th Cir.1995); *Ben-Shalom v. Marsh,* 881 F.2d 454 (7th Cir.1989), *cert. denied,* 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); *Rich v. Secretary of the Army,* 735 F.2d 1220 (10th Cir.1984); *see also High Tech Gays v. Defense Indus. Sec. Clearance Office,* 895 F.2d 563 (9th Cir.) (discussing issue in the context of the Fifth Amendment), *reh. denied,* 909 F.2d 375 (9th Cir.1990). As pointed out by Shahar, it is true that this circuit has not ruled on the issue. Nevertheless, I agree with Judge Kravitch that the facts of this case do not require us now to make a determination. The evidence supports the district court's conclusion on summary

---

rests on her contention that, as a homosexual, she was judged by Bowers ... differently than a heterosexual would have been judged."), at 44 ("Shahar's claim, however, is precisely that her conduct, as a homosexual, was evaluated differently."), at 45-46 ("Here, Shahar's direct evidence of being judged differently as a homosexual ... can fully establish the viability of her sexual orientation discrimination claim ..."), at 47 ("All of the background to Shahar's firing underscores that her acknowledged relationship with another woman triggered differential, adverse judgments about homosexuals versus heterosexuals ..."), and at 48 ("Shahar urges ... that, under the governing criteria, discrimination against gay people warrants heightened equal protection scrutiny.").

[2]I express no opinion as to the merits of Shahar's claim had it been presented as a religious fundamental rights question.

judgment that Bowers did not revoke Shahar's job offer because of her sexual orientation.  Instead, the dispute arose because Bowers believed that Shahar invoked the legal and civil significance of being married to another female, which is inconsistent with Georgia law.[3]  Therefore, I do not believe the evidence supports Shahar's Equal Protection claim.

For the reasons set forth above, I concur in Judge Godbold's opinion only to the extent that the burdens placed upon Shahar's intimate and expressive association claims are subject to strict scrutiny.  Thus, I concur in the result that this case should be remanded to the district court for further consideration.

KRAVITCH, Circuit Judge, concurring in part and dissenting in part:

In my view, this case is not primarily about religion or expression or equal protection.  Rather, the constitutional deprivation suffered by Shahar [1] is the burdening of her First Amendment right of intimate association.  In the public employment context, an employee's intimate association rights must be balanced against the government's legitimate concerns with the efficient functioning of its agencies.  I therefore disagree with the majority's holding that strict scrutiny ought to be applied in this case.  Nonetheless, utilizing a balancing test, I conclude that

---

[3]Shahar does not challenge the state of the law as it exists in Georgia with respect to same sex marriages.

[1]The plaintiff-appellant and her partner legally changed their surnames from "Brown" and "Greenfield," respectively, to "Shahar," which they understood to mean in Biblical Hebrew "[t]he act of seeking God."  Shahar Dep. at 23.  For the sake of clarity, I will refer to the plaintiff-appellant as "Shahar" and to her partner as "Greenfield."

Shahar is entitled to constitutional protection.

## I. *Intimate Association*

A. *Shahar's commitment ceremony and relationship with Greenfield is an intimate association entitled to First Amendment protection.*

Intimate associations involve "choices to enter into and maintain certain intimate human relationships." *Roberts v. United States Jaycees,* 468 U.S. 609, 617-18, 104 S.Ct. 3244, 3249, 82 L.Ed.2d 462 (1984). Such choices "must be secured against undue intrusion by the State because of the role of such relationships in safeguarding the individual freedom that is central to our constitutional scheme." *Id.* In *Roberts,* the Supreme Court enumerated several characteristics typical of relationships entitled to constitutional protection as intimate associations: "relative smallness, a high degree of selectivity in decisions to begin and maintain the affiliation, and seclusion from others in critical aspects of the relationship." *Id.* at 620, 104 S.Ct. at 3250. Family relationships, which "by their nature, involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life," "exemplify"—but do not exhaust—this category of protected associations. *Id.; see also Board of Directors of Rotary Int'l v. Rotary Club,* 481 U.S. 537, 545, 107 S.Ct. 1940, 1946, 95 L.Ed.2d 474 (1987) ("[W]e have not held that constitutional protection is restricted to relationships among family members."); Kenneth L. Karst, "The Freedom of Intimate Association," 89 Yale L.J. 624, 629-37 (1980) (defining intimate

association as "a close and familiar personal relationship with another that is in some significant way *comparable* to a marriage or family relationship") (emphasis added).  A relationship that fits these descriptions is no less entitled to constitutional protection just because it is between individuals of the same sex.

This court has taken an expansive view of the right of intimate association under the First Amendment, protecting even dating relationships.  *See Hatcher v. Bd. of Educ. & Orphanage*, 809 F.2d 1546, 1558 (11th Cir.1987) ("[E]ven a public employee's association choices as to whom to date enjoy constitutional protection.");  *Wilson v. Taylor,* 733 F.2d 1539, 1544 (11th Cir.1984) ("We conclude that dating is a type of association which must be protected by the first amendment's freedom of association.").

I agree with the district court and the majority that the relationship between Shahar and her partner qualifies as a constitutionally protected intimate association.  The ceremony was to solemnize and celebrate a lifelong commitment between the two women, who share not only an emotional bond but, as the majority exhaustively describes, a religious faith.[2]  Even if Shahar and Greenfield were not religious, I would still find that their relationship involves the type of personal bond that characterizes a First Amendment intimate association.[3]  We protect such

---

[2]Shahar has described Greenfield as her "life partner," elaborating, "Fran is my best friend and she is my main confidante, and there is just a certain closeness with her that I don't share with others."  Shahar Dep. at 5-6.

[3]To avoid confusion, my view is that relationships possessing the characteristics cataloged above—"smallness,"

associations because "the "ability independently to define one's identity that is central to any concept of liberty' cannot truly be exercised in a vacuum; we all depend on the "emotional enrichment from close ties with others.' " *Bowers v. Hardwick,* 478 U.S. 186, 205, 106 S.Ct. 2841, 2851, 92 L.Ed.2d 140 (1986) (Blackmun, J., dissenting) (quoting *Roberts,* 468 U.S. at 618, 104 S.Ct. at 3250). Where intimacy and personal identity are so closely intertwined as in the relationship between Shahar and Greenfield, the core values of the intimate association right are at stake.

B. *Shahar's intimate association rights were burdened by Bowers' withdrawal of her job offer.*

A public employee's freedom of association is burdened by adverse employment action if the protected association was a "substantial" or "motivating" factor in the employer's decision. *Mt. Healthy City School Dist. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Hatcher v. Board of Pub. Educ.,* 809 F.2d 1546, 1558 (11th Cir.1987). [4] Bowers argues that he withdrew Shahar's offer of employment only because she publicly "held herself out" as to be legally married, not because of the

---

"selectivity," "seclusion," "deep attachment[ ] and commitment[ ]," etc.—warrant constitutional protection *irrespective* of (not because of) the sexual orientation of the individuals involved.

[4]Under *Mt. Healthy* causation analysis, even if the employee proves that the conduct at issue is constitutionally protected and was a "substantial factor" in the government's decision to take adverse employment action, the government employer will still prevail if it can show by a preponderance of the evidence that it would have reached the same decision even in the absence of the employee's protected conduct. *Mt. Healthy,* 429 U.S. at 285-87, 97 S.Ct. at 575-76. Nothing in the record of this case, however, indicates that Bowers would have withdrawn Shahar's employment offer if she had not planned to participate in the commitment ceremony.

planned commitment ceremony or relationship per se, and therefore that Shahar's right to associate with her partner was not threatened. I agree with the district court, however, that Shahar's "conduct ("holding herself out' as about to marry another woman) is not sufficiently separate from her intimate association (marrying another woman) to allow a finding that this association was not burdened." *Shahar v. Bowers,* 836 F.Supp. 859, 863 (N.D.Ga.1993).

The evidence Bowers presents of Shahar's "holding herself out" as legally married is less than compelling. As the majority observes, Shahar has never asserted—and in fact has repeatedly disclaimed—any civil or legal status as married. What Shahar did do was plan and participate in a private, religious, out-of-state, commitment ceremony. She did not place an announcement in the newspaper or cast the ceremony as a political or religious rally. Shahar did characterize her marital status as "engaged" and identify Greenfield as her "future spouse" on a Department form, the purpose of which was "to elicit information which might be relevant to whether there would be some sort of conflict in [the Department's] representation of" another part of state government.[5] In so doing, Shahar provided the relevant information (Greenfield was, in fact, employed by the state) as best she could within the constraints of the standardized form, which in any case was filed unread and would never have been visible to the public. Shahar also chatted about "wedding" preparations with two Department co-workers after encountering them by chance in a restaurant while

---

[5]Bowers Dep. at 33-34.

she and Greenfield were planning the ceremony.  Finally, for the purpose of arranging her starting date, she notified a Department administrator that she was "getting married" and changing her last name to "Shahar," and she discussed the planned timing of her "wedding."[6]  All of these mentions by Shahar of her planned ceremony were reactive, responding to requests for information.[7]

Given the limited extent of Shahar's pre-termination publicizing of her commitment ceremony in terms that could be misunderstood as implying a legal relationship, I conclude, as did the district court, that Shahar "pursued her desired association only at the price of her desired employment."  *Shahar*, 836 F.Supp. at 863.

---

[6]Shahar Dep. at 77.

[7]Shahar's occasional use of the words "marriage" and "wedding" to describe the ceremony she and Greenfield were preparing to undertake hardly amounts to flaunting Georgia law. Neither "marriage" nor "wedding" is a proprietary legal term. Rabbi Friedlander testified that "marriage" is the appropriate English translation of the Hebrew term for the Jewish wedding rituals followed by Shahar and Greenfield.  Friedlander Dep. at 48-50.  And one of the English meanings of "marriage" is simply "an intimate or close union."  Webster's Third New Int'l Dictionary (1961).

Shahar might have been better served had she been consistent in referring to Greenfield as her "partner," and the event at issue as a "commitment ceremony."  On the other hand, in response to a deposition question about her use of the word "engaged" to describe her relationship with Shahar, Greenfield replied:

> We are limited by language.  It is sort of derived for heterosexuals.  We use the language because we don't have a better one to explain what we are talking about, but it describes that there is a sense of a commitment relationship, there is a union to take place, this person is part of my family....

Greenfield Dep. at 28.

C. *Intimate association claims in the public employment context are subject to a balancing test.*

The majority determines that because Shahar was involved in an intimate association akin to marriage and because the relationship was intertwined with religion, strict scrutiny should be applied. While I agree that heightened scrutiny is appropriate in cases where a public employee's First Amendment association rights have been burdened, it is also necessary to take into account the legitimate interests of government employers. These competing concerns lead me to a "balancing" analysis similar to both the test described in *Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 173, 20 L.Ed.2d 811 (1968), and strict scrutiny as it has been applied in public employment cases.

This case must be understood in light of the public employment context in which it arises. "[T]he government as employer indeed has far broader powers than does the government as sovereign." *Waters v. Churchill,* --- U.S. ----, ----, 114 S.Ct. 1878, 1886, 128 L.Ed.2d 686 (1994) (plurality opinion). The supplemental power afforded the government over its employees is justified by "the practical realities of government employment," *id.* at ----, 114 S.Ct. at 1886, and the fact that "the government is employing someone for the very purpose of effectively achieving its goals," *id.* at ----, 114 S.Ct. at 1888. "The key to First Amendment analysis of government employment decisions ... is this: The government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Id.*

Neither the Supreme Court nor the Eleventh Circuit has determined the precise standard to be applied to an employee's intimate association claim against a government employer. As the majority points out, the court in *McCabe v. Sharrett,* 12 F.3d 1558 (11th Cir.1994), identified and discussed the three most likely standards of review for this type of case:  strict scrutiny, [8] *Pickering,*[9] and *Elrod-Branti.*[10]  The issue of which standard to apply in intimate association cases remains unsettled after *McCabe,* however, for in that case the court determined that the employee's association rights were not violated under any of the three standards considered. *McCabe,* 12 F.3d at 1569-74.  In reaching this conclusion, the court noted that "[a]ll three of these schemes provide the government employer some opportunity to demonstrate

---

[8]Under strict scrutiny, the government must show that its action is "narrowly tailored to serve a compelling government interest." *McCabe,* 12 F.3d at 1566.

[9]*See Pickering v. Board of Educ.,* 391 U.S. 563, 88 S.Ct. 173, 20 L.Ed.2d 811 (1968).  The *Pickering* analysis was developed in the context of an adverse employment action on the basis of a public employee's speech.  Under *Pickering,* courts balance "the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *McCabe,* 12 F.3d at 1564 (quoting *Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734).

[10]*See Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976);  *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).  Under the *Elrod-Branti* analysis, which was developed in the context of an adverse employment action based upon a public employee's political affiliation, courts "look to whether party affiliation is important to effective performance of the job at issue." *McCabe,* 12 F.3d at 1565.

Because the *Elrod-Branti* analysis has been limited to the context of political patronage, I will exclude it from further consideration in the intimate association context.

that governmental interests justified the challenged employment action." *Id.* at 1569 n. 14.

A survey of intimate association cases (and analogous privacy cases) in the context of public employment reveals that courts, irrespective of the doctrinal test being applied, have consistently balanced the interest of the government employer in the efficient functioning of its office against the employee's interest in pursuing his or her constitutionally protected freedom.[11]

_____

[11]*See Whisenhunt v. Spradlin,* 464 U.S. 965, 970-72, 104 S.Ct. 404, 408-09, 78 L.Ed.2d 345 (1983) (Brennan, J., joined by Marshall and Blackmun, JJ., dissenting from denial of cert.) (calling for heightened scrutiny for employees' due process privacy claims, but recognizing that "[p]ublic employers ... deserve considerable latitude in enforcing codes of conduct"); *Kelley v. Johnson,* 425 U.S. 238, 244-49, 96 S.Ct. 1440, 1444-46, 47 L.Ed.2d 708 (1976) (balancing police officer's liberty interest in personal appearance against police department's need to regulate the hair length of its officers, after suggesting that state employees may be subject to more restrictive regulations where their less fundamental rights are at stake); *Stough v. Crenshaw County Bd. of Educ.,* 744 F.2d 1479 (11th Cir.1984) (applying *Pickering* balancing test to school board employee's constitutional challenge to policy prohibiting school board employees from sending their children to private schools); *Wilson v. Taylor,* 733 F.2d 1539, 1542-44 (11th Cir.1984) (assuming that *Pickering* is the appropriate standard for police officer's intimate association claim); *Dike v. School Bd.,* 650 F.2d 783, 787 (5th Cir. Unit B 1981) (nominally applying strict scrutiny to school board's burden on employee's liberty interest in breast-feeding her child, but remanding for consideration of whether school board's interests in avoiding disruption of educational process, ensuring that teachers perform their duties without distraction, and avoiding potential liability for accidents were strong enough to justify the burden); *Fyfe v. Curlee,* 902 F.2d 401 (5th Cir.1990) (applying *Pickering* balancing to public school employee's First Amendment privacy claim arising out of termination due to decision to send her daughter to private school); *Thorne v. City of El Segundo,* 726 F.2d 459, 468-72 (9th Cir.1983) (applying sliding-scale scrutiny, so that "[t]he more fundamental the rights on which the state's activities encroach, the more weighty must be the state's interest in pursuing that course of conduct," to employee's privacy and intimate association claims); *Kukla v. Village of Antioch,* 647 F.Supp. 799, 803-12, 806 (N.D.Ill.1986) (analyzing employee's intimate association claim by "weighing the amount of

I conclude that in the context of a public employee's intimate association claim based on adverse employment action, the heightened scrutiny applied by some courts is no different in practice from the *Pickering* balancing test applied by others. Both necessitate balancing the employee's constitutional association rights against the government's interest in the efficient functioning of its agency. Although *Pickering* and its direct descendants are free speech cases, their motivating principle—optimizing protection of government employees' fundamental constitutional rights and the effective provision of public services by government agencies—applies equally to intimate association cases under the First Amendment. Like core First Amendment speech, which the Supreme Court has protected in the *Pickering* line of cases as a "fundamental right" of which citizens must not be deprived just "by virtue of working for the government," *Connick v. Myers,* 461 U.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983), the right of intimate association is a fundamental aspect of personal liberty, *Roberts,* 468 U.S. 609-22, 104 S.Ct. 3249-51, 82 L.Ed.2d 462. But it is also true that an employee may disrupt the efficient workings of a government office

---

constitutional protection given to the conduct in question against the extent to which restriction of it is necessary for the government agency to function"); *Briggs v. North Muskegon Police Dept.,* 563 F.Supp. 585 (W.D.Mich.1983) (balancing police officer's intimate association and privacy rights against police department's interest in officer's job performance), *aff'd without opinion,* 746 F.2d 1475 (6th Cir.1984), *cert. denied,* 473 U.S. 909, 105 S.Ct. 3535, 87 L.Ed.2d 659 (1985); *Childers v. Dallas Police Dept.,* 513 F.Supp. 134, 139-42 (N.D.Tex.1981) (applying *Pickering* balancing test to city employee's First Amendment association claim), *aff'd without opinion,* 669 F.2d 732 (5th Cir.1982).

with First Amendment *conduct* as well as speech.  Balancing is equally appropriate in both contexts.[12]

D. *Shahar's intimate association rights outweigh Bowers' legitimate interests in this case.*

The district court applied the *Pickering* balancing test to Shahar's intimate association claims.  The court correctly noted that Bowers'

> asserted interests embody two over-arching concerns:  (1) public credibility, specifically the need to avoid the appearance of endorsing conflicting interpretations of Georgia law, and (2) internal efficiency, specifically the need to employ attorneys who act with discretion, good judgment, and in a manner which does not conflict with the work of other Department attorneys.

*Shahar,* 836 F.Supp. at 864.  Proceeding to find sufficient evidentiary support for Bowers's articulated concerns, the district court concluded that "the unique circumstances of this case show

---

[12]One aspect of how *Pickering* free speech analysis maps onto intimate association cases might be misleading.  In *Connick,* the Supreme Court made clear that a government employee can be protected under *Pickering* only if the speech in question relates to "matters of public concern."  461 U.S. at 147, 103 S.Ct. at 1690.  Obviously, it would be paradoxical to require a government employee's intimate association to relate to a matter of public concern as a threshold requirement for constitutional protection. The point of the *Connick* requirement, however, is simply to operationalize *Pickering* 's purpose of upholding only the more fundamental rights of public employees and not turning federal courts into general review boards for personnel decisions.  *Id.* Speech on matters of public concern is given categorical protection under *Pickering* and *Connick* because this type of speech "occupies "the highest rung of the hierarchy of First Amendment values.' "  *Id.* at 145, 103 S.Ct. at 1689 (quoting *Carey v. Brown,* 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1980)).

> Therefore, inasmuch as *Connick* may be instructive in the intimate association context, it reaffirms the appropriateness of the sliding-scale scrutiny inherent in a balancing test that weighs intimate associations closer to the core of the First Amendment right more heavily than those closer to the periphery.

that [Bowers's] interests in the efficient operation of Department outweigh [Shahar's] interest in her intimate association with her female partner." *Id.* at 865. Absent from the district court's "balancing" discussion, however, is an explicit juxtaposition of Shahar's intimate association rights or any discussion of their countervailing weight.

The relationship celebrated through Shahar's and Greenfield's commitment ceremony is close to the core of the constitutional right to intimate association, for it exemplifies the characteristics determined by the Supreme Court to warrant special protection. In *Roberts,* the Court explained that between the poles of "family" relationships and large business enterprises "lies a broad range of human relationships that may make greater and lesser claims to constitutional protection from particular incursions by the State." *Id.* at 618-22, 104 S.Ct. at 3250-51. Because Shahar's commitment ceremony and relationship with Greenfield fall close to the "family" end of this continuum, her intimate association rights weigh heavily on the balance.

On the other hand, Bowers is the chief legal officer of the state of Georgia, with responsibility for "seeing that State agencies uphold the law and [for] upholding the law in general."[13] Although Georgia does not have a statute which prohibits same-sex "marriages," and Shahar violated no law by planning and participating in the commitment ceremony with her partner, the state does not officially recognize such a union and would not

---

[13]Bowers Dep. at 42.

authorize the issuance of a marriage license to a same-sex couple.[14]

Bowers does not allege that Shahar's planned ceremony caused any actual disruption of the functioning of the Georgia Department of Law. Although we must consider a government employer's "reasonable predictions of disruption," *Waters,* --- U.S. at ----, 114 S.Ct. at 1887, the employer's assessment of harm should be discounted by the probability of its realization in order to weigh it fairly against an actual burden on an employee's constitutional rights. Certainly, the mere "subjective apprehension that [the employee's conduct] might have an adverse impact upon" the government agency will not outweigh such a burden. *Williams v. Roberts,* 904 F.2d 634, 638 (11th Cir.1990).

Bowers first determined that Shahar's "holding herself out as "married' to another woman ... indicated a lack of discretion regarding the Department's public position on the proper application for the [Georgia] sodomy statute and Georgia's marriage laws."[15] Shahar's pre-termination conduct, however, seems unrelated to the Department's legal positions. Second, Bowers characterized Shahar's representations about her commitment ceremony as "political conduct demonstrating that she did not believe in and was not going to uphold the laws regarding marriage and sodomy."[16]

---

[14]Nor does Georgia recognize same-sex common-law marriages. *See* O.C.G.A. § 19-3-1; *Georgia Osteopathic Hosp., Inc. v. O'Neal,* 198 Ga.App. 770, 403 S.E.2d 235, 243 (1991) ("In order for a common-law marriage to come into existence, the parties must be able to contract, must agree to live together as man and wife, and must consummate the agreement.").

[15]Br. of Appellee at 12-13.

[16]Br. of Appellee at 13; Bowers Dep. at 62-63.

But there is no evidence in the record to support such an inference; to the contrary, Shahar has never asserted any legal benefit from her marriage, and her commitment ceremony was far from a political demonstration or an act of civil disobedience. In any case, the Department has a rule against certain political activities, which Shahar had understood to preclude advocacy on behalf of, for instance, gay rights.[17] Third, Bowers makes the general assertion that Shahar's presence in the Department would have a "disruptive" effect on her co-workers.[18] Again, there is no evidence in support of this prediction in the record, and some evidence against: Shahar's summer clerkship with the Department appears to have been a success.

Bowers further contends that he was motivated to withdraw Shahar's job offer by the concern that the Department would be perceived by the public as disregarding Georgia law as it pertains to homosexual marriages (which are not recognized) and sodomy (which is illegal).[19] Again, Shahar's commitment ceremony and relationship were not, before the inception of this case, thrust into the public domain. Even if members of the public were to become aware of and misunderstand the asserted status of the relationship between Shahar and her partner, it is questionable whether they would infer that the Department, by employing Shahar, was acquiescing in the legally legitimate status of the union.

---

[17]Br. of Appellee at 5; Shahar Dep. at 60-61.

[18]Br. of Appellee at 13; Bowers Dep. at 90-91.

[19]The Georgia consensual sodomy statute, O.C.G.A. § 16-6-2, which makes oral and anal sex illegal, applies equally to homosexuals and heterosexuals.

Shahar neither violated Georgia's laws pertaining to marriage nor attempted to avail herself of any legal rights or privileges reserved for legally married people. And there is no evidence that Shahar violated Georgia's sodomy law.[20] Catering to private prejudice is not a legitimate government interest. *See City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 448, 105 S.Ct. 3249, 3259, 87 L.Ed.2d 313 (1985) ("mere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable [by the government], are not permissible bases" for decisionmaking); *Palmore v. Sidoti,* 466 U.S. 429, 433, 104 S.Ct. 1879, 1882, 80 L.Ed.2d 421 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").

Although the unique status of Bowers' office makes this a close case, I conclude that Shahar's constitutional interest in pursuing her intimate association outweighs any threat to the efficient operation of the Georgia Department of Law. As the ultimate balancing under *Pickering* is a question of law for this court to decide *de novo, Kurtz v. Vickrey,* 855 F.2d 723, 732 (11th

---

[20]Bowers admits that he has no knowledge of Shahar's actual sexual behavior. Bowers Dep. at 69. Instead, in considering whether to withdraw Shahar's job offer, he claims to have relied on "the public perception that "the natural consequence of a marriage is some sort of sexual conduct'... and if it's homosexual, it would have to be sodomy." Brief of Appellee at 10-11; Bowers Dep. at 80-81. The bare description of a person as "homosexual," however, is hardly sufficient to support an inference that he or she has engaged in the specific conduct violative of Georgia's sodomy law. *Cf. Able v. United States,* 880 F.Supp. 968, 976 (E.D.N.Y.1995) ("This court concludes that under the First Amendment a mere statement of homosexual orientation is not sufficient proof of intent to commit acts as to justify the initiation of discharge proceedings.").

Cir.1988), I would reverse summary judgment in favor of Bowers and grant summary judgment in favor of Shahar on her intimate association claim.

## II. *Expressive Association*

"Expressive" association claims involve the "right to associate for the purpose of engaging in those activities protected by the First Amendment—speech, assembly, petition for the redress of grievances, and the exercise of religion." *Roberts,* 468 U.S. at 618, 104 S.Ct. at 3249. The right of expressive association protects communal pursuit of the rights expressly protected by the First Amendment. *Id.* at 618, 622, 104 S.Ct. at 3249, 3252; *McCabe v. Sharrett,* 12 F.3d 1558, 1563 (11th Cir.1994). In this case, Shahar's commitment ceremony constituted an association for the purpose of, at least in part, engaging in the exercise of religion, a protected First Amendment activity.[21] I agree with the majority that Bowers' withdrawal of Shahar's job offer burdened her right of expressive association.

This court has stated that the *Pickering* balancing test is the correct standard of review when a public employer burdens an employee's First Amendment right of expressive association. *Hatcher v. Board of Public Educ. and Orphanage,* 809 F.2d 1546, 1559 & n. 26 (11th Cir.1987). The majority now determines that *Board of Directors of Rotary Int'l v. Rotary Club,* 481 U.S. 537, 549, 107

---

[21]On the facts of this case, I do not believe that Shahar has stated a viable expressive association claim based on social or political aspects of her commitment ceremony and relationship with her partner. In any case, an association claim based on public expression would be in tension with Shahar's more compelling intimate association claim.

S.Ct. 1940, 1948, 95 L.Ed.2d 474 (1987), overruled *Hatcher* on this point because the Supreme Court in *Rotary* applied a compelling interest test to the plaintiff's expressive association claim. *Rotary,* however, was not an employment case, and, as explained above, in the employment context the state has "far broader powers than does the government as sovereign." *Waters,* --- U.S. at ----, 114 S.Ct. at 1886. Because I believe that this court continues to be bound by *Hatcher, Pickering,* not strict scrutiny, should be applied in reviewing Shahar's expressive association claim.[22]

"The intrinsic and instrumental features" of expressive and intimate association "may, of course, coincide." *Roberts,* 468 U.S. at 618, 104 S.Ct. at 3249. In this case, as the district court found, Shahar's expressive association claim overlaps not just her intimate association claim but also her free exercise claim. I agree with the district court that Shahar's expressive association claim "offers no greater claim to constitutional protection than [her] intimate association claim," *Shahar,* 836 F.Supp. at 862, given that *Pickering* should be applied to both, and therefore I would not address it any further.

---

[22]*Connick* 's public concern requirement does not stand in the way of Shahar's expressive association claim in this circuit. *See Hatcher,* 809 F.2d at 1558 ("We conclude, however, that *Connick* is inapplicable to freedom of [expressive] association claims."). Other circuits have applied the *Connick* requirement to expressive association claims. *See Griffin v. Thomas,* 929 F.2d 1210, 1212-14 (7th Cir.1991); *Boals v. Gray,* 775 F.2d 686, 691-93 (6th Cir.1985); *see also Clark v. Yosemite Community College Dist.,* 785 F.2d 781, 791 (9th Cir.1986) (noting that because defendant had not raised the question, the court had no need to decide whether the plaintiff's "right of association with the union touches on a matter of public concern so as to give rise to a cause of action in federal court for a violation of First Amendment rights").

III. *Free Exercise of Religion*

I would not remand for reconsideration on the free exercise claim. Rather, because in my view this case is not about the free exercise of religion, and because the violation of Shahar's intimate association rights is dispositive, I would not reach this issue.

IV. *Equal Protection*

Shahar's equal protection claim is based on the contention that Bowers withdrew her job offer, at least in part, because she is a homosexual. Shahar argues that classifications based on sexual orientation should be subject to strict scrutiny under the Equal Protection Clause.[23]

The facts of this case, however, do not support Shahar's contention that Bowers withdrew her offer because of her sexual

---

[23]Judge Godbold would hold that strict scrutiny applies to Shahar's equal protection claim because Shahar's fundamental right of free exercise of religion has been burdened. This equal protection analysis is both flawed and superfluous. Shahar does not argue, and the record does not indicate, that she was treated differently because of her religion. *See, e.g., Elston v. Talladega County Bd. of Educ.,* 997 F.2d 1394, 1406 (11th Cir.1993) ("To establish an equal protection clause violation, a plaintiff must demonstrate that a challenged action was motivated by an intent to discriminate.") (citing *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,* 429 U.S. 252, 265, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977); *Washington v. Davis,* 426 U.S. 229, 238-48, 96 S.Ct. 2040, 2047-52, 48 L.Ed.2d 597 (1976)). Nor did Bowers *classify* employees in the manner contemplated by equal protection principles. *See, e.g., Nordlinger v. Hahn,* 505 U.S. 1, 10, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992) (stating the general equal protection principle that rational basis review applies "unless a *classification* warrants some form of heightened review because it jeopardizes exercise of a fundamental right or *categorizes* on the basis of an inherently suspect characteristic") (emphasis added). Moreover, even if Shahar could make out an equal protection claim based on her fundamental right of free exercise, this claim would be subsumed by her direct free exercise claim; no greater constitutional protection would result.

orientation.[24]  Bowers asserted that he withdrew Shahar's job offer only because of conduct surrounding her commitment ceremony and relationship with her partner, not because of her status as a homosexual.  The record establishes that the Department has neither a policy nor a proven practice of excluding homosexuals from employment, and that Bowers generally does not inquire into the sexual practices or preferences of applicants and employees.  Furthermore, a number of Department employees, including at least two in management positions (but not, apparently, Bowers himself), were aware that Shahar was a lesbian when the offer of employment was extended.  Although Shahar offers some indirect evidence of divergent attitudes in the Department towards homosexuals and heterosexuals, she has not shown that she was treated differently, for equal protection purposes, on the basis of sexual orientation.[25]  Her equal protection claim thus fails.

Accordingly, I CONCUR in part and DISSENT in part.

---

[24]Shahar further argues that disputed issues of material fact should have precluded summary judgment.  After reviewing the record, however, I agree with the district court that the pertinent facts are undisputed.

[25]Thus, we need not reach the issue of whether homosexuals constitute a suspect class entitled to strict scrutiny for equal protection claims.